**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

WILDEARTH GUARDIANS,

     Plaintiff,

v.

LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, and
ARKANSAS RIVER POWER AUTHORITY,

     Defendants.

_____

## COMPLAINT
_____

## INTRODUCTION

1.     Plaintiff WildEarth Guardians ("Guardians") brings this suit pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. §§ 7601 *et seq*., against the Lamar Utilities Board, d/b/a Lamar Light and Power, and Arkansas River Power Authority (collectively "Lamar Utilities") for violating air pollution emissions standards, limitations, and permit conditions at the Lamar coal-fired electric generating unit, also known as the Lamar Repowering Project (hereinafter the "Lamar Plant").  Guardians seeks declaratory and injunctive relief against Lamar Utilities, as well as applicable civil penalties.

2.     The Lamar Plant is located near the center of town in Lamar, Colorado.  The Lamar Plant is three blocks off Main Street, less than 500 feet from a residential neighborhood,

and within a mile from three elementary schools.

3.      Since coming on-line in May of 2009, the Lamar Plant has repeatedly violated its permitted limits for several dangerous air pollutants, including nitrogen oxides, sulfur dioxide, carbon monoxide, and opacity.  These emissions are released from the smokestack at the Lamar Plant.  The Lamar Plant's emissions pose a threat to the health of local residents and the surrounding environment.

4.      Nitrogen oxide ("NOx") pollution can adversely affect human respiratory health, aggravate heart disease, lead to the formation of fine particle pollution that can cause premature death, and contribute to the formation of ground-level ozone, the key ingredient of smog.

5.      Sulfur dioxide ("SO₂") is also a respiratory irritant.  Studies show that short-term exposure to SO₂ pollution can lead to increased visits to emergency rooms for respiratory illness. Similar to NOx, SO₂ can also form fine particle pollution.

6.      Exposure to carbon monoxide ("CO") can cause vision problems, reduce the ability to work or learn, reduce mental dexterity, make it difficult to perform complex tasks, and, at high levels, cause death.  At low levels, those with heart disease are especially susceptible to the harmful effects of CO.

7.      Particulate matter ("PM") is a complex mixture of extremely small particles and liquid droplets that are so small that they can get deep into the lungs and cause serious health problems.  PM pollution is made up of a number of components, including acids (such as nitrates and sulfates), organic chemicals, metals, and soil or dust particles.  PM emissions are important due to their numerous serious and adverse health effects, including increased respiratory symptoms, such as irritation of the airways, coughing, or difficulty breathing; decreased lung function; aggravated asthma; development of chronic bronchitis; irregular heartbeat; nonfatal

heart attacks; and premature death in people with heart or lung disease.

8.      Opacity monitoring serves an important function in the operation of a power plant by indicating whether pollution control equipment is properly functioning and whether emission limits are being maintained.  The U.S. Environmental Protection Agency ("EPA") considers opacity monitoring as a surrogate for assessing mass emissions and as a means to assure effective particulate emissions control.  The Lamar Plant's numerous violations of its opacity requirements pose a serious threat to public health because these violations indicate that excessive levels of harmful PM emissions are being released into the air.

9.      Guardians' members in Lamar are concerned by the visible and foul-smelling emissions coming from the smokestack of the Lamar Plant.  They worry about breathing air that is impaired by excessive pollution from the Lamar Plant, about the soot from coal ash on their property, about the health of their children and grandchildren, and about the next time they will be woken up in the middle of the night to loud noises and malfunctions at the Lamar Plant.  The Lamar Plant's excessive and illegal emissions of air pollution and their insufficient monitoring of harmful pollution threatens the health and quality of life of Guardians' members.

10.     In light of the above, Guardians asks this Court to: (1) declare that Lamar Utilities' operation of the Lamar Plant in excess of the emission limits set forth in its air quality permit issued by the State of Colorado, as alleged herein, violates the Clean Air Act; (2) declare that Lamar Utilities' failure to comply with the monitoring requirements set forth in its permit violates the Clean Air Act; (3) enjoin Lamar Utilities from future operation of the Lamar Plant unless and until Lamar Utilities successfully demonstrates its ability to fully and continuously comply with its permit, the Clean Air Act, and all applicable regulatory requirements; (4) issue any further injunctive relief as may be necessary and proper to ensure Lamar Utilities'

compliance with its permit and the Clean Air Act; (5) assess civil penalties against the Lamar

Utilities Board and Arkansas River Power Authority, jointly and severally, for these repeated

violations of the Lamar Plant's permit and the Clean Air Act; and (6) award Guardians its costs

and attorneys fees.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over the claims set forth in this

Complaint pursuant to 42 U.S.C. § 7604(a)(citizen suit provision of the Clean Air Act), 28

U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. §§ 2201 (declaratory judgment).

The requested relief is proper under 42 U.S.C. § 7604(a), 42 U.S.C. § 7413(b), and 28 U.S.C. §

2201.

12.     Pursuant to 42 U.S.C. § 7604(c), venue properly rests in this judicial district

because the Lamar Plant is located in this District at 100 North Second Street, Lamar, Colorado

81052, and its violations have occurred and continue to occur in this District.

13.     On October 27, 2010, Guardians provided Lamar Utilities with notice of the

Clean Air Act violations alleged in this Complaint[1] as required by 42 U.S.C. § 7604.  Guardians

also provided notice to the EPA Administrator, and to the State of Colorado, pursuant to 42

U.S.C. § 7604(b).  A true and accurate copy of Guardians' notice letter and return receipt cards

are attached hereto as Exhibit A.

---

[1]     Guardians also gave Lamar Utilities notice of its intent to sue over future and additional
violations uncovered after the date of the notice letter, which is sufficient notice for all
subsequent violations of the same emission limits.  See e.g., St. Bernard Citizens for
Environmental Quality, Inc. v. Chalmette Refining, L.L.C., 500 F.Supp.2d 592, 609 -
610 (E.D.La. 2007)(when post-complaint exceedances are of the same parameter as those
exceedances detailed in the initial notice under Clean Air Act, the initial notice provides the
permittee with sufficient notice of the plaintiff's intent to sue and of the pollution problem
occurring during and *after* the period covered by the notice letter).

14.     More than 60 days have elapsed since Guardians provided notice of the Clean Air

Act violations alleged in this Complaint.  Neither EPA nor the State of Colorado has commenced

or diligently prosecuted a civil action in a court of this State to redress the Clean Air Act

violations alleged in this Complaint.

15.     Lamar Utilities remains in violation of the Clean Air Act and there exists now

between the parties an actual, justiciable controversy within the meaning of the Declaratory

Judgment Act, 28 U.S.C. § 2201.

## PARTIES

16.     Plaintiff WILDEARTH GUARDIANS is a non-profit corporation with

approximately 4,500 members throughout the United States, including many in Colorado and

several in the town of Lamar.  Guardians' mission is to bring people, science, and the law

together in defense of the American West's rivers, forests, deserts, grasslands, wildlife, people,

and the delicate web of life to which we are inextricably linked.  Guardians works to protect

public health and the environment from air pollution and to safeguard the climate from

greenhouse gas emissions.

17.     Members of Guardians are extremely concerned over the impacts of the Lamar

Plant to their community.  Since the Lamar Repowering Project came online in May of 2009,

members of Guardians have witnessed and suffered harm from Lamar Utilities' irresponsible

operation of the Lamar Plant and ongoing lack of due care in controlling air pollution, and from

abnormal and excessive releases of pollution into the air.

18.     Members of Guardians live, work, garden, and engage in outdoor recreation and

family activities in areas affected by Lamar Utilities' insufficient monitoring of air pollution,

excessive emissions, and violations of its air quality permit.  Guardians' members are exposed

to, and threatened with exposure to, particles and other harmful pollutants from the smokestack of the Lamar Plant.  Further, Guardians' members have suffered, and will continue to suffer, actual and threatened interference with their use and enjoyment of their property and surrounding public areas from the violations alleged in this Complaint.  This actual and threatened interference with Guardians' members use and enjoyment of their property arises from, but is not limited to, visible and offensive emissions, foul-smelling emissions, and insufficient monitoring of these emissions at the Lamar Plant.

19.     WildEarth Guardians has at least six members that live within approximately one mile of the Lamar Plant, all of whom intend to continue living in this area indefinitely.  Since the Lamar Repowering Project came online, these members have expressed numerous concerns to local, state, and federal officials over the air quality impacts from the Lamar Plant.  Guardians' members have logged incidents of foul smells, visible emissions, painfully loud noises, and mechanical problems at the Lamar Plant.  They have taken pictures showing visible emissions and have testified as to the sulfurous and other foul smells that often emanate from the Lamar Plant.  They have publicly called for the Lamar Plant to be cleaned up or to stop burning coal, to prevent further harmful impacts to their community.  They have demanded and continue to demand that Lamar Utilities live up to the commitments it has made to comply with its air quality permit and to safeguard public health and well-being.

20.     The acts and omissions alleged herein expose Guardians' members to harmful pollution that threatens their health and welfare, interferes with their use and enjoyment of their property and the surrounding public areas, denies them protection of their health and well-being guaranteed by the Clean Air Act, the Colorado State Implementation Plan, and Lamar's permit issued under these authorities, and negatively impacts their aesthetic and recreational interests.

The relief requested herein will redress these injuries.

21.     Guardians' members have a substantial interest in this matter and are adversely affected and aggrieved by Lamar Utilities' failure to comply with the Clean Air Act and will continue to be adversely affected unless the Court orders the requested relief.  Guardians brings this action on behalf of its adversely affected members.  The interests that Guardians seeks to protect in this action are germane to the organization's purposes.  Neither the claims asserted, nor the relief requested, require the participation of individual members of Guardians as parties to this lawsuit.  A decision requiring Lamar Utilities to comply with all emission limitations and monitoring requirements under its air quality permit and the Clean Air Act would redress these harms to Guardians' members.

22.     Defendant LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER owns and operates the Lamar Plant, in conjunction with the Arkansas River Power Authority. Lamar Light and Power is a municipal utility providing electric power to Lamar, McClave, Wiley, Bristol, and Hartman in Bent and Prowers Counties, Colorado.  Lamar Light and Power is a "person" within the meaning of 42 U.S.C. § 7602(e).

23.     Defendant ARKANSAS RIVER POWER AUTHORITY owns and operates the Lamar Plant, in conjunction with Lamar Light and Power.  The Arkansas River Power Authority was formed in 1979 as a coalition of seven municipalities: Lamar, Las Animas, LaJunta, Holly, Springfield, Trinidad, and Raton, New Mexico.  The Arkansas River Power Authority is a political subdivision of the State of Colorado, established pursuant to the Power Authority Act, COLO. REV. STAT. § 29-1-204.  The principal office for the Arkansas River Power Authority is located in Lamar, Colorado.  Arkansas River Power Authority is a "person" within the meaning of 42 U.S.C. § 7602(e).

## LEGAL BACKGROUND

### The Clean Air Act and Colorado SIP

24.     Congress enacted the Clean Air Act "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of the population." 42 U.S.C. § 7401(b)(2). The Clean Air Act sets out a regulatory scheme designed to prevent and control air pollution.

25.     Under Title I of the Clean Air Act, EPA promulgates National Ambient Air Quality Standards ("NAAQS"), which define the level of air quality necessary to protect the public health and welfare for certain "criteria pollutants," specifically sulfur dioxide, nitrogen oxides, particulate matter, carbon monoxide, lead, and ozone. 42 U.S.C. § 7409(a)-(b); 40 C.F.R. pt. 50.

26.     The Clean Air Act allows States to implement federal clean air requirements through EPA–approved plans, known as State Implementation Plans ("SIPs"). 42 U.S.C. § 7410(a). SIPs must include permitting programs and specific emission standards and limitations, which provide for the implementation, maintenance, and enforcement of the NAAQS in each state. Id.

27.     All SIP provisions approved by EPA become federal law and are enforceable by any person in federal court, through the citizen suit provision of the Clean Air Act. 42 U.S.C. § 7604(a).

28.     The State of Colorado's Air Quality Control Commission ("AQCC") promulgated a SIP for Colorado pursuant to the Colorado Air Pollution Prevention and Control Act ("Colorado Act"), C.R.S. Title 25, Art. 7, Part 2, for the implementation of the Clean Air Act and the attainment and maintenance of NAAQS. The Colorado SIP has been approved by EPA as set

forth in 40 C.F.R. § 52.323, and is incorporated by reference into the Code of Federal Regulations at 40 C.F.R., Subpart G, § 52.230, *et seq*.

### New Source Performance Standards

29.     New Source Performance Standards ("NSPS") are nationwide uniform technology-based standards for new or modified stationary sources. 42 U.S.C. § 7411. Pursuant to Section 111 of the Clean Air Act, 42 U.S.C. § 7411, EPA is required to establish NSPS for any category of new and modified stationary sources that the Administrator of the EPA, in his or her judgment, finds "causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare."

30.     A "new source" is "any stationary source the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed regulations) prescribing a standard of performance . . . applicable to such source." 42 U.S.C. § 7411(a)(2); 40 C.F.R. § 60.1. A "stationary source" is "any building, structure, facility, or installation which emits or may emit any air pollutant." 42 U.S.C. § 7411(a)(3); 40 C.F.R. § 60.2.

31.     After the effective date of a performance standard, it is unlawful for any owner or operator of any "new source" to operate such source in violation of an applicable NSPS. 42 U.S.C. § 7411(e). Thus, a violation of an applicable NSPS is a violation of Section 111(e) of the Clean Air Act. Id.

32.     EPA has promulgated NSPS for electric steam generating units ("EGUs"). 40 C.F.R. §§ 60.40-60.46 (Subpart D) and 40 C.F.R. §§ 60.40Da-60.52Da (Subpart Da). The NSPS regulations of 40 C.F.R. pt. 60, Subpart Da apply to every fossil fuel-fired EGU constructed, modified, or reconstructed after September 18, 1978, and capable of combusting more than 73 megawatts (250 million Btu/hour) heat input of fossil fuel (either alone or in combination with

any other fuel). 40 C.F.R. § 60.40Da(a).

33.     Sources subject to the NSPS for PM shall not discharge any gases into the atmosphere "which exhibit greater than 20 percent opacity (6-minute average), except for one 6-minute period per hour of not more than 27 percent opacity." 40 C.F.R. § 60.42Da(b).

34.     Sources subject to the NSPS that commenced construction, reconstruction, or modification after February 28, 2005 shall not discharge any gases into the atmosphere that contain $SO_2$ in excess of either 1.4 lb/MWh on a 30-day rolling average basis or 5 percent of the potential combustion concentration (95 percent reduction) on a 30-day rolling average basis. 40 CFR §§ 60.43Da(i)(1)(i), 60.43Da(i)(1)(ii).

35.     Sources subject to the NSPS that commenced construction, reconstruction, or modification after February 28, 2005 shall not discharge any gases into the atmosphere that contain $NO_x$ in excess of 1.0 lb/MWh on a on a rolling 30-day average basis. 40 C.F.R. § 60.44Da(e)(1).

36.     40 C.F.R. § 60.49Da includes specific requirements for continuous opacity monitoring systems, 40 C.F.R. § 60.49Da(a), and continuous emissions monitoring systems for $SO_2$, 40 C.F.R. § 60.49Da(b), and $NO_x$ , 40 C.F.R. § 60.49Da(c).

37.     40 C.F.R. § 60.13(e) requires all continuous monitoring systems to be in continuous operation, except during periods of system breakdowns, repairs, calibration checks, and zero and span adjustments.

38.     40 C.F.R. § 60.13(f) requires all continuous monitoring systems to be installed "such that representative measurements of emissions or process parameters from the affected facility are obtained."

39.     NSPS requirements are enforceable by any person in federal court, pursuant to the

citizens suit provision of the Clean Air Act.  42 U.S.C. § 7604(a), (f).

### Clean Air Act Citizen Suit Enforcement

40.     Under 42 U.S.C. § 7604(a), any person may file suit in federal district court against any "person" who is "alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."

41.     The Clean Air Act defines "person" to include municipalities and political subdivisions of a State.  42 USCA § 7604(e).  "Municipality" is defined as "a city, town, borough, county, parish, district, or other public body created by or pursuant to State law." 42 USCA § 7604(f).

42.     A citizen suit is barred if a "State has commenced and is diligently prosecuting a civil action in a court of . . . a State to require compliance with the standard, limitation, or order[.]"  42 U.S.C. § 7604(b)(1)(B).

43.     An "emission standard or limitation" is defined to include any emission limitation, standard of performance, or emission standard under the Clean Air Act, any requirement of Sections 111 and 112 of the Clean Air Act (without regard to whether such requirement is expressed as an emission standard or otherwise), as well as any EPA-approved standard of performance or emission limitation under the SIP and any permit term or condition. 42 U.S.C. § 7604(f).

44.     42 U.S.C. § 7413(b), amended in part by the Debt Collection Improvement Act of 1996, authorizes injunctive relief and civil penalties of up to $37,500 per day for each violation occurring after January 12, 2009.  See also 42 U.S.C. § 7413(e); 28 U.S.C. § 2461(a); 40 C.F.R.

§ 19.4; 74 Fed. Reg. 626 (Jan. 7, 2009).

## FACTUAL BACKGROUND

### Lamar Plant

45.     The Lamar Utilities Board ("LUB") was created by the City of Lamar and is responsible for the development, production, purchase, and distribution of electricity for the City.

46.     In 1979, the Arkansas River Power Authority ("ARPA") was created as a political subdivision of the state of Colorado for the purpose of furnishing the wholesale electric power requirements of member municipalities, including the City of Lamar.

47.     In October 2003, LUB and ARPA entered into a "Letter of Intent for the Lamar Repowering Project." The Repowering Project intended to replace the existing natural gas-fired EGU with a 43-megawatt, coal-fired boiler type power plant.

48.     In November 2004, LUB and ARPA entered into a Joint Operating Agreement for the development of the Lamar Repowering Project and its continued operation and maintenance.

49.     Construction of the Lamar Repowering Project began in late July 2006.

50.     The Lamar Plant, with its new coal-fired boiler, began operation sometime on or about May 18, 2009.

51.     Lamar Utilities submitted an official notice of start-up for this boiler to Colorado Department of Public Health and Environment ("CHPHE") on June 1, 2009.

### Lamar's Permit

52.     On February 3, 2006, CHPHE issued Permit Number 05PR0027 ("Permit") to Lamar Utilities for the construction and operation of the Lamar Plant. The Permit has been modified twice, on August 21, 2007 and October 13, 2009. The permit provisions relevant to the allegations in this Complaint did not change in the permit revisions in 2007 and 2009.

53.     A true and accurate copy of Lamar's Permit, 05PR0027, Modification No. 2, is attached hereto as Exhibit B.

54.     Permit number 05PR0027 was issued by CDPHE pursuant to Air Quality Control Commission Regulation No. 3, 5 CCR 1001-5, a federally approved provision of the Colorado SIP, 40 C.F.R. § 52.320, *et seq.*, and is therefore enforceable by citizens through the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a).  See 62 Fed. Reg. 2910 (January 21, 1997); 62 Fed. Reg. 13,332 (March 20, 1997); 64 Fed. Reg. 32,418 (June 17, 1999); 66 Fed. Reg. 47,086 (September 11, 2001).

55.     Condition 3 of Lamar's Permit specifies that if multiple provisions apply, the most stringent provision will be applicable.

### Emission Limitations for NO<sub>X</sub>, SO<sub>2</sub>, CO, and Opacity

56.     Lamar's Permit includes limits for emissions of $NO_X$, $SO_2$, CO, and opacity from the circulating fluidized bed boiler, also known as the coal-fired boiler or AIRS Point ID 004.

57.     Opacity readings reflect the degree to which emissions reduce the transmission of light and obscure the view of an object in the background.

58.     An opacity value of 0% means that all light passes through, and an opacity of 100% means that no light can pass through.

59.     Condition 1 of Lamar's Permit limits visible emissions at the Lamar Plant to 20% opacity during normal operation.  During periods of startup, building of a new fire, cleaning of fire boxes, soot blowing, process modification, or adjustment or occasional cleaning of control equipment, the visible emissions shall not exceed 30% opacity for more than six minutes in any sixty consecutive minutes.

60.     Condition 4 of Lamar's Permit limits the 6-minute average opacity of emissions

from the coal-fired boiler to 10%, except during periods of startup and shutdown, in which case "opacity shall not exceed the limits specified under visible emissions condition."

61.     Condition 4 of Lamar's Permit limits emissions of $SO_2$ from the coal-fired boiler to a daily average of not more than 0.103 pound per mmBtu heat input.

62.     Condition 4 of Lamar's Permit limits emissions of CO from the coal-fired boiler to not more than 76.5 pounds per hour based on a rolling 3-hour average.

63.     Condition 7 of Lamar's Permit requires the Lamar Plant to comply with Colorado Regulation No. 6 (Standards of Performance for New Stationary Sources), 5 CCR 1001-8, and the federally enforceable NSPS regulations, 40 C.F.R. §§ 60.40-60.46 (Subpart D) and 40 C.F.R. §§ 60.40Da-60.52Da (Subpart Da).

64.     Condition 7 of Lamar's Permit limits the opacity of emissions from the coal-fired boiler to 20%, except for one 6-minute period per hour of not more than 27%.

65.     Condition 7 of Lamar's Permit limits the $SO_2$ emission rate from the coal-fired boiler to no more than 1.4 lb/MWh on a 30-day rolling average basis.

66.     Condition 7 of Lamar's Permit also limits the $NO_X$ emission rate from the coal-fired boiler to no more than 1.0 lb/MWh on a rolling 30-day average basis.

67.     Condition 10 of Lamar's Permit limits the total emissions of $NO_X$ at the Lamar Plant to no more than 17.4 tons per month during the first twelve months of operation, and to no more than 205.0 tons per year thereafter.

**Continuous Monitoring Requirements**

68.     Lamar's Permit requires continuous monitoring of opacity, $SO_2$, and $NO_X$.

69.     When measuring opacity, continuous emission monitoring systems ("CEMS") are known as continuous opacity monitoring systems ("COMS").

70.     Condition 7 of Lamar's Permit requires Lamar Utilities to install, calibrate, maintain, and operate a COMS, and record the output of the system, for measuring the opacity of emissions from the coal-fired boiler at the Lamar Plant.  Compliance with Lamar's 20% opacity limitation is demonstrated with the use of a COMS.

71.     Condition 7 of Lamar's Permit requires Lamar Utilities to install, calibrate, maintain, and operate a CEMS, and record the output of the system, for measuring $SO_2$ emissions from the coal-fired boiler at the Lamar Plant.

72.     Condition 7 of Lamar's Permit requires Lamar Utilities to install, calibrate, maintain, and operate a CEMS, and record the output of the system, for measuring $NO_X$ emissions from the coal-fired boiler at the Lamar Plant.

73.     Lamar's Permit requires continuous monitoring of CO.  Condition 12 of Lamar's Permit requires Lamar's boiler to be equipped with a CEMS for CO.

74.     Lamar's Permit requires the CEMS at the Lamar Plant to be operating at all times to ensure representative measurements of emissions, with limited exceptions.

75.     Condition 7 of Lamar's Permit requires the Lamar Plant to comply with Colorado Regulation No. 6, Part A, Subpart A, which incorporates by reference the General Provisions of 40 C.F.R. Part 60, including compliance with opacity standards according to 40 C.F.R. § 60.11 and continuous monitoring system operation as required under 40 C.F.R. § 60.13.

76.     Condition 12 of Lamar's Permit requires all CEMS to be capable of measuring and recording the emissions of $SO_2$, and $NO_X$, CO, and opacity, and to show compliance with these emission limits.  The CEMS must conform to the requirements of 40 C.F.R. Part 72, 40 C.F.R. Part 75, and 40 C.F.R. Part 76.

77.     Lamar Utilities must "ensure that all continuous emission and opacity monitoring

systems required by [40 C.F.R. Part 75] are in operation and monitoring unit emissions or opacity at all times that the affected unit combusts any fuel" and during the time following combustion when fans are still operating.  If the fluidized boiler is combusting any fuel, except as provided in § 75.11(e) (special considerations during the combustion of gaseous fuels), the Lamar Plant's continuous emission and opacity monitoring systems may only be down "during periods of calibration, quality assurance, or preventive maintenance," which must be performed pursuant to specific requirements set forth in 40 C.F.R. Part 75, and during "periods of repair, periods of backups of data from the data acquisition and handling system, or recertification performed pursuant to § 75.20." See 40 C.F.R. § 75.10(d).

78.     Downtime refers to the amount of time that the boiler is producing emissions, but the COMS or CEMS are not monitoring those emissions, due to monitor or non-monitor failure.

79.     During periods of monitor downtime, Lamar Utilities is unable to determine whether the Lamar Plant is complying with its applicable opacity requirements or emission limitations.

### Lamar's Repeated Emission Limit Exceedances

80.     According to semi-annual emission reports submitted by Lamar Utilities on January 29, 2010, July 29, 2010, and January 28, 2011 to the Colorado Department of Public Health and Environment ("CDPHE"), since beginning operation on May 18, 2009, the Lamar Plant has regularly violated its emission limits established in Permit No. 05PR0027 issued by CDPHE for the construction and operation of the Lamar Plant.  Furthermore, Lamar Utilities is failing to monitor emissions in accordance with its permit.

81.     On January 29, 2010, Lamar Utilities submitted its Semi-Annual Report to CDPHE for the Lamar Plant, Permit No. 05PR0027, covering April 14, 2009 through December

31, 2009.  This Semi-Annual Report contains Quarterly EPA Summary Reports for NOx, SO2, CO, and opacity for the second, third, and fourth quarters of 2009.  Rick Rigel, Lamar Utilities Board Superintendent, signed each Quarterly EPA Summary Report contained therein, certifying that "the information contained in this report is true, accurate, and complete."

82.    A true and accurate copy of excerpts from the Semi-Annual Report submitted by Lamar Utilities on January 29, 2010 is attached hereto as Exhibit C (with the exception of any handwritten notes or markings added by CDPHE).

83.    On July 29, 2010, Lamar Utilities submitted its Semi-Annual Report to CDPHE for the Lamar Plant, Permit No. 05PR0027, covering January 1, 2010 through June 30, 2010.  This Semi-Annual Report contains Quarterly EPA Summary Reports for NOx, SO2, CO, and opacity for the first and second quarter of 2010.  Rick Rigel, Lamar Utilities Board Superintendent, signed each Quarterly EPA Summary Report, certifying that "the information contained in this report is true, accurate, and complete."

84.    A true and accurate copy of excerpts from the Semi-Annual Report submitted by Lamar Utilities on July 29, 2010 is attached hereto as Exhibit D (with the exception of any handwritten notes or markings added by CDPHE).

85.    On October 12, 2010, Lamar Utilities submitted a Revised Emissions Report to CDPHE to revise incorrect data resulting from CEMS programming errors and deficiencies for Permit No. 05PR0027.  This Revised Emissions Report was submitted to CDPHE by Virgil Cochran, the Environmental Compliance Manager for Lamar Light and Power.

86.    A true and accurate copy of the Revised Emissions Report submitted by Lamar Utilities on October 12, 2010 is attached hereto as Exhibit E (with the exception of any handwritten notes or markings added by CDPHE).

87.     Lamar Utilities' Revised Emissions Report includes an addendum report to Lamar Utilities' Semi-Annual Report that was submitted on July 29, 2010.  The addendum report shows 30-day rolling average emission for the Lamar Plant for the applicable pollutants that have 30 day rolling average limitations ($NO_x$ lbs/MMBTU, $NO_x$ lbs/MWhr, and $SO_2$ lbs/MWhr).  The Revised Emissions Report also includes a spreadsheet, wherein Lamar Utilities identifies all days in which its CEMS data showed exceedances of 30-day rolling average limitations, from May 18, 2009 through June 30, 2010.

88.     On January 28, 2011, Lamar Utilities submitted its Semi-Annual Report to CDPHE for the Lamar Plant, Permit No. 05PR0027, covering July 1, 2010 through December 31, 2010.  This Semi-Annual Report contains Quarterly EPA Summary Reports for $NO_x$, $SO_2$, CO, and opacity for the third and fourth quarter of 2010.  Rick Rigel, Lamar Utilities Board Superintendent, signed each Quarterly EPA Summary Report, certifying that "the information contained in this report is true, accurate, and complete."

89.     A true and accurate copy of excerpts from the Semi-Annual Report submitted by Lamar Utilities on January 28, 2011 is attached hereto as Exhibit F (with the exception of any handwritten notes or markings added by CDPHE).

90.     From May 18, 2009, the first day of operation for the Lamar Plant's new coal-fired boiler, until December 30, 2010, when the plant temporarily went off-line in attempt to repair a tube failure and make equipment modifications, the Lamar Plant has repeatedly exceeded its emission limitations and violated its Permit.  Lamar Utilities has also repeatedly failed in its attempts to bring the Lamar Plant into compliance with the emission limits set forth in its Permit and the Clean Air Act.

91.     On October 27, 2010, Guardians provided Lamar Utilities with notice of its intent

to file a citizen suit under the Clean Air Act for violations at the Lamar Plant. These violations were based upon the semi-annual emission reports submitted to CDPHE on January 29, 2010 and July 29, 2010.[2] Guardians also gave Lamar Utilities notice of its intent to sue over future and additional violations uncovered after the date of the notice letter. See Exhibit A.

92.      After Guardians gave Lamar Utilities notice of its intent to sue on October 27, 2010, the Lamar Plant continued to exceed its emissions limits for $NO_x$, $SO_2$, CO, and opacity and failed to continuously monitor these emissions as required by its Permit. These violations were ongoing when the plant temporarily went off-line on December 30, 2010, and will continue when the Lamar Plant resumes operation in the near future.

93.      On February 18, 2010, the Lamar Plant was placed back into service after being off-line for several months for the final installation of a selective non-catalytic reduction (SNCR) system for $NO_x$ control and to repair various boiler tube leaks. Despite these equipment modifications, the Lamar Plant continued to exceed its emission limitations for $NO_x$, $SO_2$, CO, and opacity.

94.      On or about February 23, 2010, Rick Rigel communicated in an email to Tom Garabedian, an employee or representative of Babcock & Wilcox, the boiler manufacturer for the Lamar Plant, that: "We cannot continue to operate knowingly exceeding the $NO_x$ requirements as we are now. We must either reduce $NO_x$ very quickly or we will be forced to come off-line."

95.      However, after February 23, 2010, Lamar Utilities continued to operate while knowingly exceeding their $NO_x$ emission limitations. The Lamar Plant exceeded its 1.0 lb/MWh emission limit for $NO_x$ every day on the following dates during the months of March, April,

---

[2]      However, the violations alleged in this Complaint are based upon the revised data from Lamar Utilities' Revised Emissions Report, referenced in paragraph 85, for $NO_x$ lbs/MWhr and $SO_2$ lbs/MWhr, and the data from the spreadsheet in that report.

May, and June of 2010; from March 1, 2010 through March 24, 2010; from April 7, 2010 through April 24, 2010; April 26, 2010; April 29, 2010; May 5, 2010 through May 31, 2010; and every day during the month of June 2010.  From July 1, 2010 though December 30, 2010, the Lamar Plant exceeded its 1.0 lb/MWh emission limit for $NO_X$ on 136 days.

96.     In June 2010, a boiler tuning consultant from E-TECH Industrial Services performed a boiler tuning at the Lamar Plant in an attempt to achieve emissions compliance with its Permit requirements.  Despite this boiler tune-up, the Lamar Plant continued to exceed its emission limitations for $NO_X$, $SO_2$, CO, and opacity.

97.     In August of 2010, Lamar Utilities went off-line several times to inspect and address problems with their multi-cyclone dust collector (MDC), boiler, and furnace. Despite these equipment inspections and repairs, the Lamar Plant continued to exceed its emission limitations for $NO_X$, $SO_2$, CO, and opacity.

98.     In September of 2010, Lamar Utilities performed tests and inspections of their equipment during a planned fall outage.  Despite these equipment inspections and repairs, the Lamar Plant continued to exceed its emission limitations for $NO_X$, $SO_2$, CO, and opacity.

99.     In November of 2010, a service technician from Babcock & Wilcox, began work to tune Lamar's boiler.  However, these attempts were unsuccessful and the SNCR system was not performing as expected.  Despite equipment inspections, tests, and repairs, the Lamar Plant continued to exceed its emission limitations for $NO_X$, $SO_2$, CO, and opacity.

100.    Additional boiler tune-ups and tests were planned for December 2010 and January 2011.  However, according to Lamar Light and Power, a tube failure tripped the boiler off-line on December 30, 2010.

101.    On or about January 7, 2011, Lamar Utilities gave formal notification to CDPHE

that the Lamar Repowering Project is off-line.  The Lamar Plant has been off-line since December 30, 2010.

102.    On or about January 7, 2011, Rick Rigel communicated to Mike Skorupka, the legal administrator for the Air Pollution Control Division of CDPHE, that the Lamar Plant will be back online sometime between mid to late spring of 2011.

103.    On or about January 7, 2011, Rick Rigel communicated to Mike Skorupka that Lamar's boiler vender is working to modify equipment at the Lamar Plant and Lamar Utilities "does not anticipate coming back on-line until those modifications have been completed and we believe we can operate within permit limits."

104.    Lamar Utilities has made repeated promises to CDPHE over the last two years that modifications were being made to reduce the Lamar Plant's emission exceedances. However, the Lamar Plant has not successfully come into compliance with the requirements of its Permit and the Clean Air Act.

105.    The Lamar Plant has an ongoing compliance problem and it is likely that the Lamar Plant will continue to repeatedly violate its emission limitations and monitoring requirements when the plant comes back online this spring.

106.    Based upon Lamar Utilities' repeated unsuccessful attempts to bring the Lamar Plant into compliance with its applicable air emission limitations and permit requirements, and its plans to start up the plant again in mid to late spring, future violations are imminent.

107.    Based upon Lamar Utilities' past failures at bringing the Lamar Plant into compliance with its Permit and the Clean Air Act and the repeated violations as alleged herein, there is a reasonable expectation that such violations will recur when the Lamar Plant resumes operations.

108.    As the Lamar Plant will resume operation in the near future, additional violations of Lamar's Permit, the Clean Air Act, and applicable air quality regulations are certain and imminent.

### Lamar's Compliance Order on Consent

109.    On or about September 24, 2010, Lamar Utilities entered into a compliance order on consent ("Consent Order") with CDPHE regarding certain violations at the Lamar Plant under the Colorado Air Pollution and Prevention and Control Act.  This Consent Order was the result of a compliance advisory issued by the Air Pollution Control Division of CHPHE, mailed on July 20, 2010.

110.    This Consent Order constitutes an informal enforcement action.

111.    Because the State of Colorado has not commenced, nor is diligently prosecuting, a civil action in a court of this State to require compliance with a standard, limitation, or order, this Consent Order does not bar this citizen suit under the Clean Air Act, 42 U.S.C. § 7604(b)(1)(B).

112.    The Consent Order does not fully or adequately address Lamar Utilities' violations as set forth herein.  The Consent Order restates the conditions in Permit Number 05PR0027, but does not require additional terms or conditions, such as increased reporting or more stringent emission controls, to ensure that violations are prevented or more quickly detected and remedied.

113.    The penalties in the Consent Order were not adequate to deter future violations. The Consent Order contains an administrative penalty of only $22,750.00, for a fraction of the violations contained herein.  Lamar Utilities may pursue a Supplemental Environmental Project to mitigate the full amount of this penalty, upon satisfaction of certain requirements. Conversely, under the Clean Air Act, penalties of up to $37,500 per day per violation are

provided to deter future violations.

114.     Pursuant to this Consent Order, Lamar Utilities agreed to comply with all provisions of the Colorado Air Pollution and Prevention Control Act and its implementing regulations to control the emission of air pollutants from the facility, effective immediately.

115.      However, even after entering into this Consent Order, Lamar Utilities continued to operate the Lamar Plant in violation of its emission limits and failed to appropriately monitor emissions in accordance with its Permit, the Colorado Air Pollution and Prevention Control Act and its implementing regulation, and the Clean Air Act.

116.     After the date of the Consent Order, the Lamar Plant continued to exceed its emission limitations for $NO_X$, $SO_2$, CO, and opacity.

## FIRST CAUSE OF ACTION
### Violation of NSPS $NO_X$ Limitations (1.0 lb/Mwh)

117.     Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

118.     Lamar Utilities has violated and continues to violate the Clean Air Act by failing to limit $NO_X$ emissions at the Lamar Plant to a daily average of 1.0 lb/MWh, as required by Lamar's Permit and the applicable NSPS regulations for $NO_X$, 40 C.F.R. § 60.44Da(e)(1).

119.     Based on CEMS data submitted by Lamar Utilities in its Revised Emissions Report, the Lamar Plant exceeded its daily average of 1.0 lb/MWh for $NO_X$ emissions on 270 days from May 18, 2009 through June 30, 2010.

120.     Based on CEMS data submitted by Lamar Utilities in its Semi-Annual Report on January 28, 2011, the Lamar Plant exceeded its daily average of 1.0 lb/MWh for $NO_X$ emissions on 136 days from July 1, 2010 through December 31, 2010.  In the third quarter of 2010, the Lamar Plant exceeded its 1.0 lb/MWh emission limit for $NO_X$ 1728.83 hours, or approximately

93.1% of its operating time.  In the fourth quarter of 2010, the Lamar Plant exceeded its 1.0

lb/MWh emission limit for NOx 1326.80 hours, or according to Lamar Utilities own

approximation, "103.2% of its operating time."

121.    Lamar Utilities failed to limit NOx emissions at the Lamar Plant to a daily

average of 1.0 lb/MWh at least 406 times from May 18, 2009 to December 31, 2010, violating

Permit 05PR0027 Condition 7.

122.    Lamar Utilities therefore violated the NSPS emission limits for NOx at least 406

times from May 18, 2009 to December 31, 2010, in violation of Section 111 of the Clean Air

Act.  42 U.S.C. § 7411(e).

123.    Lamar Utilities' violations of these NOx limits are violations of an "emission

standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that

the violations have been repeated and will continue when the Lamar Plant resumes operation in

the near future.

124.    As a result of the violations alleged herein, Lamar Utilities has violated the Clean

Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

**SECOND CAUSE OF ACTION**
*Violation of NSPS SO2 Limitations (1.4 lb/Mwh)*

125.    Guardians incorporates the allegations in all preceding paragraphs of this

Complaint as if set forth in full herein.

126.    Lamar Utilities has violated and continues to violate the Clean Air Act by failing

to limit SO2 emissions at the Lamar Plant to a daily average of 1.4 lb/MWh, as required by

Lamar's Permit and the applicable NSPS regulations for NOx, 40 C.F.R. § 60.44Da(i)(1).

127.    Based on CEMS data submitted by Lamar Utilities in its Revised Emissions

Report, the Lamar Plant exceeded its 1.4 lb/MWh emission limit for SO2 on 160 days from May

18, 2009 through June 30, 2010.

128.     Based on CEMS data submitted by Lamar Utilities in its Semi-Annual Report on January 28, 2011, the Lamar Plant exceeded its 1.4 lb/MWh emission limit for $SO_2$ on 73 days from July 1, 2010 through December 31, 2010.

129.     Lamar Utilities failed to limit $SO_2$ emissions to a daily average of 1.4 lb/MWh at least 233 times from May 18, 2009 to December 31, 2010, violating Permit 05PR0027 Condition 7.

130.     Lamar Utilities therefore violated the NSPS emission limits for $SO_2$ at least 233 times from May 18, 2009 to December 31, 2010, in violation of Section 111 of the Clean Air Act.  42 U.S.C. § 7411(e).

131.     Lamar Utilities' violations of said $SO_2$ limits are violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that the violations have been repeated and will continue when the Lamar Plant resumes operation in the near future.

132.     As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

### THIRD CAUSE OF ACTION
*Violation of Opacity Limitations*

133.     Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

134.     Lamar Utilities has violated and continues to violate the Clean Air Act by failing to limit the opacity of emissions at the Lamar Plant to 20%, as required by Lamar's Permit and the NSPS for particulate matter, 40 C.F.R. § 60.42Da(b).

135.     Based on CEMS data submitted by Lamar Utilities in its Semi-Annual Reports,

the Lamar Plant exceeded the 20% opacity limit during four (4) 6-minute intervals in the second quarter of 2009, during one (1) 6-minute interval in the third quarter of 2009, during twenty (20) 6-minute intervals in the third quarter of 2010, and during sixteen (16) 6-minute intervals in the fourth quarter of 2010.

136.    Lamar Utilities violated its Permit by allowing excessive opacity from the Lamar Plant's emissions with at least 41 known violations from May 18, 2009 through December 31, 2010, violating Permit 05PR0027 Condition 7.

137.    Lamar Utilities therefore violated the NSPS requirements for opacity at least 41 times from May 18, 2009 to December 31, 2010, in violation of Section 111 of the Clean Air Act.  42 U.S.C. § 7411(e).

138.    Lamar Utilities' violations of its opacity limit are violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that the violations have been repeated and will continue when the Lamar Plant resumes operation in the near future.

139.    As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

## FOURTH CAUSE OF ACTION
### Violation of SO$_2$ Limitations (0.103 lb/mmBtu)

140.    Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

141.    Lamar Utilities has violated and continues to violate the Clean Air Act by failing to limit SO$_2$ emissions at the Lamar Plant to a daily average of 0.103 lb/mmBtu, as required by Lamar's Permit.

142.    Based on CEMS data submitted by Lamar Utilities in its Semi-Annual Reports,

the Lamar Plant exceeded the 0.103 lb/mmBtu daily average for $SO_2$ limit on the following

dates: January 13, 2010; February 14, 2010; February 15, 2010; April 10, 2010; May 5, 2010;

May 22, 2010; May 29, 2010; May 30, 2010; May 31, 2010; June 8, 2010; June 9, 2010; June 17,

2010; June 18, 2010; June 29, 2010; July 6, 2010; July 12, 2010; July 13, 2010; July 14, 2010;

July 26, 2010; every day from July 28, 2010 through August 3, 2010; every day from August 13,

2010 through August 16, 2010; August 22, 2010; August 31, 2010; September 1, 2010;

September 2, 2010; September 3, 2010; September 6, 2010; September 7, 2010; every day from

September 9, 2010 through September 13, 2010; September 15, 2010; September 16, 2010;

September 20, 2010; every day from September 22, 2010 through September 26, 2010;

November 8, 2010; November 9, 2010; November 14, 2010; November 22, 2010; and December

23, 2010.  Emission rates were as high as 0.680 lb/mmBtu.

143.    Lamar Utilities failed to limit $SO_2$ emissions at the Lamar Plant to a daily average

of 0.103 lb/mmBtu at least 55 times from May 18, 2009 to December 31, 2010, violating Permit

05PR0027 Condition 4.

144.    Lamar Utilities' violations of said $SO_2$ limits are violations of an "emission

standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that

the violations have been repeated and will continue when the Lamar Plant resumes operation in

the near future.

145.    As a result of the violations alleged herein, Lamar Utilities has violated the Clean

Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

**FIFTH CAUSE OF ACTION**
*Violation of CO Limitations (76.5 lb/hr)*

146.    Guardians incorporates the allegations in all preceding paragraphs of this

Complaint as if set forth in full herein.

147.     Lamar Utilities has violated and continues to violate the Clean Air Act by failing to limit CO emissions at the Lamar Plant to the rolling three hour average of 76.5 lb/hour, as required by Lamar's Permit.

148.     Based on CEMS data submitted by Lamar Utilities in its Semi-Annual Reports, the Lamar Plant exceeded its 76.5 lb/hour emission limit for CO every day on the following dates: from April 8, 2010 through June 30, 2010; from July 26, 2010 through September 26, 2010; and from November 5, 2010 through December 30, 2010.

149.     Based on CEMS data submitted by Lamar Utilities in its Semi-Annual Reports, the Lamar Plant had at least 1354.45 hours of excess emissions for CO from May 18, 2009 through December 31, 2010.

150.     Lamar Utilities failed to limit CO emissions at the Lamar Plant to the rolling three hour average of 76.5 lb/hour at least 1,355 times from May 18, 2009 through December 31, 2010, violating Permit 05PR0027 Condition 4.

151.     Lamar Utilities' violations of said CO limits are violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that the violations have been repeated and will continue when the Lamar Plant resumes operation in the near future.

152.     As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

## SIXTH CAUSE OF ACTION
### *Violation of Monthly NOx Limitations*

153.     Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

154.     Lamar Utilities has violated and continues to violate the Clean Air Act by failing

to limit NOx emissions at the Lamar Plant to 17.4 tons per month, as required by Lamar's Permit.

155.    Based on CEMS data in Lamar Utilities' semi-annual reports, the Lamar Plant exceeded its 17.4 ton monthly NOx limit by emitting 17.6 tons of NOx in August 2009, 24.6 tons of NOx in September 2009, 25.8 tons of NOx in October 2009, and 20.7 tons of NOx in November 2009.

156.    Lamar Utilities failed to limit its August 2009, September 2009, October 2009, and November 2009 monthly emissions of NOx at the Lamar Plant to 17.4 tons per month, violating Permit 05PR0027 Condition 10.  Lamar Utilities therefore violated its Permit and the Clean Air Act on every day during the months of August 2009, September 2009, October 2009, and November 2009, for a total of 122 violations.

157.    Lamar Utilities' violations of its monthly NOx limits are violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f).

158.    There is evidence that Lamar's NOx violations were repeated and Lamar Utilities will continue to violate its total emission limitations for NOx, now limited to 205.0 tons per year, when the Lamar Plant resumes operation in the near future.

159.    As a result of the violations alleged herein, Lamar Utilities violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

### SEVENTH CAUSE OF ACTION
*Violation of Continuous Opacity Monitoring Requirements*

160.    Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

161.    Lamar Utilities has violated and continues to violate the Clean Air Act by failing to continuously monitor opacity when operating the coal-fired boiler at the Lamar Plant, as

required by Lamar's Permit, 40 C.F.R. Part 75, 40 C.F.R. § 60.13, and 40 C.F.R. § 60.49Da(a),

and by failing to operate the COMS in conformance with these requirements.

162.    From May 18, 2009 to December 31, 2010, Lamar Utilities failed to continuously

operate the COMS at the Lamar Plant to ensure compliance with Lamar Utilities' 20% opacity

limitations and failed to provide representative measurements of opacity during that time.

163.    According to semi-annual reports submitted by Lamar Utilities, the COMS

experienced over 2,282 minutes (38 hours) of downtime from May 18, 2009 through December

31, 2010:

| Year/Quarter | Downtime Minutes (reason) |
|---|---|
| 2009/2 | 68 (non-monitor equipment malfunction); 311 (other known causes) |
| 2009/3 | 450 (other known causes) |
| 2009/4 | 386 (other known causes) |
| 2010/1 | 156 (other known causes) |
| 2010/2 | 35 (non-monitor equipment malfunction); 360 (other known causes) |
| 2010/3 | 43 (non-monitor equipment malfunction); 278 (other known causes) |
| 2010/4 | 225 (other known causes) |
| Total Minutes | 2282 |

164.    Lamar Utilities violated applicable continuous opacity monitoring requirements

with at least 2,282 known minutes of downtime from May 18, 2009 to December 31, 2010.

165.    Most of the Lamar Plant's monitoring downtime, as reported in its semi-annual

reports, does not fall within one of the limited exceptions provided by Clean Air Act regulations

and Lamar's Permit.  The COMS downtime is also unexcused because it includes repeated and

foreseeable equipment failures.  Lamar Utilities has not met the requirements of its Permit and

the Clean Air Act in order to excuse its repeated monitoring violations.

166.    Lamar Utilities has unlawfully operated the Lamar Plant by failing to

continuously monitor opacity, violating Permit 05PR0027, Conditions 7 and 12.

167.    Lamar Utilities' violations of said monitoring requirements are violations of an

"emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that the violations have been repeated and will continue when the Lamar Plant resumes operation.

168.     As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

## EIGHTH CAUSE OF ACTION
### *Violation of NOx Monitoring Requirements*

169.     Guardians incorporates the allegations in all preceding paragraphs in this Complaint as if set forth in full herein.

170.     Lamar Utilities has violated and continues to violate the Clean Air Act by failing to continuously monitor NOx when operating the coal-fired boiler at the Lamar Plant, as required by Lamar's Permit, 40 C.F.R. Part 75, 40 C.F.R. § 60.13, and 40 C.F.R. § 60.49Da(c)(1), and by failing to operate the CEMS in conformance with these requirements.

171.     From May 18, 2009 to December 31, 2010, Lamar Utilities failed to continuously operate the CEMS at the Lamar Plant to ensure compliance with the 1.0 lb/MWh emission limit for NOx and failed to provide representative measurements of those emissions.

172.     According to semi-annual reports submitted by Lamar Utilities, the NOx CEMS experienced at least 1,957.8 hours of downtime from May 18, 2009 to December 31, 2010:

| Year/Quarter | Downtime Hours (reason) |
| --- | --- |
| 2009/2 | 7.13 (non-monitor equipment malfunction); 115.05 (other known causes) |
| 2009/3 | 0.85 (non-monitor equipment malfunction; 12.5 (other known causes) |
| 2009/4 | 29.07 (other known causes) |
| 2010/1 | 638.47 (other known causes) |
| 2010/2 | 1028.25 (other known causes) |
| 2010/3 | 126.48 (other known causes) |
| 2010/4 | 0 |
| Total Hours | 1957.80 |

173.    Lamar Utilities has violated its NOx monitoring requirements with at least 1,957.8 known hours of downtime from May 18, 2009 to December 31, 2010.

174.    Most of the Lamar Plant's monitoring downtime, as reported in its semi-annual reports, does not fall within one of the limited exceptions provided by Clean Air Act regulations and Lamar's Permit.  The CEMS downtime is also unexcused because it includes repeated and foreseeable equipment failures.  Lamar Utilities has not met the requirements of its Permit and the Clean Air Act in order to excuse its repeated monitoring violations.

175.    Lamar Utilities has unlawfully operated the Lamar Plant by failing to comply with its CEMS requirements for NOx, violating Permit 05PR0027, Conditions 7 and 12.

176.    Lamar Utilities' violations of said emission monitoring requirements are violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that the violations have been repeated and will continue when the Lamar Plant resumes operation.

177.    As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

## NINTH CAUSE OF ACTION
### Violation of SO2 Monitoring Requirements

178.    Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

179.    Lamar Utilities has violated and continues to violate the Clean Air Act by failing to continuously monitor SO2 when operating the coal-fired boiler at the Lamar Plant, as required by Lamar's Permit, 40 C.F.R. Part 75, 40 C.F.R. § 60.13, and 40 C.F.R. § 60.49Da(b), and by failing to operate the CEMS in conformance with these requirements.

180.    From May 18, 2009 to December 31, 2010, Lamar Utilities failed to continuously

operate the CEMS at the Lamar Plant to ensure compliance with the 1.4 lb/MWh emission limit

for $SO_2$ and failed to provide representative measurements of those emissions.

181.    According to semi-annual reports submitted by Lamar Utilities, the $SO_2$ CEMS

experienced at least 1,934.8 hours of downtime from May 18, 2009 through December 31, 2010:

| Year/Quarter | Downtime Hours (reason) |
|---|---|
| 2009/2 | 7.13 (non-monitor equipment malfunction); 116.05 (other known causes) |
| 2009/3 | 0.85 (non-monitor equipment malfunction; 12.5 (other known causes) |
| 2009/4 | 29.07 (other known causes) |
| 2010/1 | 638.47 (other known causes) |
| 2010/2 | 1004.25 (other known causes) |
| 2010/3 | 126.48 (other known causes) |
| 2010/4 | 0 |
| Total Hours | 1934.8 |

182.    Lamar Utilities has violated its $SO_2$ monitoring requirements with at least 1,934.8

known hours of downtime from May 18, 2009 to December 31, 2010.

183.    Most of the Lamar Plant's monitoring downtime, as reported in its semi-annual

reports, does not fall within one of the limited exceptions provided by Clean Air Act regulations

and Lamar's Permit.  The CEMS downtime is also unexcused because it includes repeated and

foreseeable equipment failures.  Lamar Utilities has not met the requirements of its Permit and

the Clean Air Act in order to excuse its repeated monitoring violations.

184.    Lamar Utilities has unlawfully operated the Lamar Plant by failing to comply with

its CEMS requirements for $SO_2$, violating Permit 05PR0027, Conditions 7 and 12.

185.    Lamar Utilities' violations of said emission monitoring requirements are

violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f),

and there is evidence that the violations have been repeated and will continue when the Lamar

Plant resumes operation.

186.     As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

## TENTH CAUSE OF ACTION
### *Violation of CO Monitoring Requirements*

187.     Guardians incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

188.     Lamar Utilities has violated and continues to violate the Clean Air Act by failing to continuously monitor CO when operating the coal-fired boiler at the Lamar Plant, as required by Lamar's Permit.

189.     From May 18, 2009 to December 31, 2010, Lamar Utilities failed to continuously operate the CEMS at the Lamar Plant to ensure compliance with 76.5 lb/hour emission limit for CO and failed to provide representative measurements of those emissions.

190.     According to semi-annual reports submitted by Lamar Utilities, the CO CEMS experienced at least 381.35 hours of downtime from May 18, 2009 through December 31, 2010.

| Year/Quarter | Downtime Hours (reason) |
|---|---|
| 2009/2 | 7.13 (non-monitor equipment malfunction); 116.05 (other known causes) |
| 2009/3 | 0.85 (non-monitor equipment malfunction; 12.5 (other known causes) |
| 2009/4 | 29.07 (other known causes) |
| 2010/1 | 46.87 (other known causes) |
| 2010/2 | 45.38 (other known causes) |
| 2010/3 | 25.0 (monitor equipment malfunctions); 55.7 (other known causes) |
| 2010/4 | 3.0 (monitor equipment malfunctions); 36.8 (other known causes) |
| Total Hours | 381.35 |

191.     Lamar Utilities has violated these continuous monitoring requirements for $SO_2$ with at least 381.35 known hours of downtime from May 18, 2009 to December 31, 2010.

192.     Most of the Lamar Plant's monitoring downtime, as reported in its semi-annual reports, does not fall within one of the limited exceptions provided by Clean Air Act regulations

and Lamar's Permit.  The CEMS downtime is also unexcused because it includes repeated and foreseeable equipment failures.  Lamar Utilities has not met the requirements of its Permit and the Clean Air Act in order to excuse its repeated monitoring violations.

193.    Lamar Utilities has unlawfully operated the Lamar Plant by failing to comply with its CEMS requirements for CO, violating Permit 05PR0027 Condition 12.

194.    Lamar Utilities' violations of said emission monitoring requirements are violations of an "emission standard or limitation" under the Clean Air Act, 42 U.S.C. § 7604(f), and there is evidence that the violations have been repeated and will continue when the Lamar Plant resumes operation.

195.    As a result of the violations alleged herein, Lamar Utilities has violated the Clean Air Act, as well as applicable provisions of the Colorado SIP and its Permit.

## PRAYER FOR RELIEF

WHEREFORE, based upon the allegations contained in the foregoing paragraphs, WildEarth Guardians requests that this Court:

1.    Declare that Defendants' operation of the Lamar Plant in excess of the emission limits set forth in their Permit as alleged herein violates the Clean Air Act;

2.    Declare that Defendants' failure to continuously monitor opacity violates the Clean Air Act;

3.    Declare that Defendants' failure to continuously operate their CEMS violates the Clean Air Act;

4.    Order Defendants to comply with their Permit and all applicable requirements pursuant to the Clean Air Act, State, and federal regulations.

5.    Order Defendant to take all necessary steps to comply with all applicable

emission standards, including, but not limited to, installing adequate pollution controls and developing protocols and processes to eliminate violations of their Permit and the Clean Air Act.

6.      Enjoin Defendants from operating their coal-fired boiler unless and until they demonstrate that they can successfully and continuously operate within the limits set forth in their Permit and the Clean Air Act.

7.      Enjoin Defendants from operating their coal-fired boiler unless and until their COM system and CEMS equipment is functioning properly.

8.      Assess a civil penalty against the Defendants, jointly and severally, of up to $37,500.00 per day for each violation of the Clean Air Act and applicable regulations;

9.      Award Guardians its cost and reasonable attorneys' fees incurred in initiating and prosecuting this action; and

10.     Grant such other relief as the Court deems just and proper.

Respectfully submitted,

*/s/ Ashley D. Wilmes*
Ashley D. Wilmes
WildEarth Guardians
827 Maxwell Avenue, Suite L
Boulder, Colorado 80304
Tel. 859-312-4162
awilmes@wildearthguardians.org

*/s/ James J. Tutchton*
James J. Tutchton
WildEarth Guardians
6439 E. Maplewood Ave.
Centennial, CO 80111
Tel. 720-301-3843
jtutchton@wildearthguardians.org

/s/ *Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz
WildEarth Guardians
312 Montezuma Ave.
Santa Fe, NM 87501
Tel. 505-988-9126 x1158
sruscavagebarz@wildearthguardians.org

*Attorneys for Plaintiff WildEarth Guardians*

Dated: March 24, 2011

Plaintiff:
WildEarth Guardians
1536 Wynkoop St, Ste 301
Denver, CO 80202

**EXHIBITS TO COMPLAINT**

A.    WildEarth Guardians' Notice of Intent to Sue Letter, dated October 27, 2010

B.    Construction Permit 05PR0027, Modification No. 2, issued to Lamar Utilities by Colorado Department of Public Health and Environment

C.    Excerpts from Lamar Utilities' Semi-Annual Report for April 14, 2009 through December 31, 2009

D.    Excerpts from Lamar Utilities' Semi-Annual Report for January 1, 2010 through June 30, 2010

E.    Lamar Utilities' Revised Emissions Report, submitted on October 12, 2010

F.    Excerpts from Lamar Utilities' Semi-Annual Report for July 1, 2010 through December 31, 2010