**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:11-cv-00742-MSK–MJW

WILDEARTH GUARDIANS,

      Plaintiff,

v.

DEFENDANTS LAMAR UTILITIES BOARD d/b/a LAMAR LIGHT AND POWER, and
ARKANSAS RIVER POWER AUTHORITY,

      Defendants.

---

**PLAINTIFF'S AMENDED RESPONSE TO**
**DEFENDANTS' MOTION TO DISMISS COMPLAINT**

---

      As permitted by order of this Court, Dkt. # 21, Plaintiff WildEarth Guardians

("Guardians") hereby files its amended response to the Motion to Dismiss, Dkt. # 12, filed by

Defendants Lamar Utilities Board, d/b/a Lamar Light and Power, and Arkansas River Power

Authority ("Defendants") on May 5, 2011:

## Table of Contents:

I.  Introduction……………………………………………………………………………………..3

II.  Standard of Review…………………………………………………………………...……5

III.  Legal Background: Clean Air Act…………………………………………………...……5

IV.  Factual Background………………………………………………………………...…..6

    A.  Events Prior to Filing of Guardians' Complaint on March 23, 2011……………7

    B.  Guardians' Complaint……………………………………………………...…10

    C.  New Events and Lamar's Continuing Violations…………………….…………12

V.  Argument………………………………………………………………………...……17

    A.  Burden of Proof:  Defendants Bear the Heavy Burden of Demonstrating to the Court that Guardian's Claims Are Moot………………………………………17

    B.  Guardians' Claims for Declaratory and Injunctive Relief Are Not Moot, as a Live Case and Controversy Exists Between the Parties………………………..26

        1.  Violations at the LRP are Continuing…………………………………27

        2.  Defendants' Recent Violations are Not Excused by the "Testing" Provisions of the April 2011 Compliance Order………………………...29

    C.  As the Consent Orders do Not Fully Address the Violations alleged in Guardians' Complaint, This Court May Grant Effective Relief to Guardians……...……..34

    D.  Guardians' Claims for Relief are Not Rendered Moot by Informal Administrative Consent Orders………………………………………………….…………….37

    F.  Guardians' Citizen Suit is Proper and Not an Impermissible Collateral Attack on the Penalties Assessed in the Consent Orders ………………………….....…45

VI.  Conclusion…………………………………………………………………………….47

## I.     INTRODUCTION

Guardians filed this suit pursuant to the citizen suit provision of the Clean Air Act, 42 U.S.C. §§ 7601 et seq., against the Defendants for repeatedly violating their air pollution emissions standards, limitations, and permit conditions at the Lamar coal-fired electric generating unit, also known as the Lamar Repowering Project (hereinafter the "LRP" or the "Lamar Plant").  Since coming on-line in May of 2009, the LRP has repeatedly violated its permitted limits for several dangerous air pollutants, including nitrogen oxides ("NOX"), sulfur dioxide ("SO2"), carbon monoxide ("CO"), and opacity.[1]  These violations are disturbing in light of the serious adverse health effects associated with these pollutants, and the LRP's location near the center of Lamar, Colorado, less than 500 feet from a residential neighborhood, and within a mile from several elementary schools.  Guardians brought this case on behalf of its members, including those in Lamar, whose health and well-being are repeatedly threatened by their exposure to foul smells, visible emissions, and painfully loud noises from the LRP.

Guardians seeks declaratory and injunctive relief against Defendants, as well as applicable civil penalties.  See Plaintiff's Complaint ("Compl.") at ¶ 1, Dkt. # 1.  Defendants filed a Motion to Dismiss this Complaint as moot, pursuant to Federal Rule of Civil Procedure 12(b)(1).  Dkt. # 12.  In their motion, Defendants contend that this case is moot as a result of informal enforcement actions by the Colorado Department of Public Health and Environment ("CDPHE"), which resulted in settlement agreements between the Defendants and CDPHE, in the form of "Compliance Orders on Consent" in September 2010 and April 2011.

---

[1]     Opacity is monitored as a surrogate for assessing mass emissions and particulate emissions.

In the Tenth Circuit, Defendants bear the heavy burden of proving mootness by demonstrating that (1) the administrative consent orders at issue completely and irrevocably eradicated the effects of the alleged violation and (2) that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur.  Relying on Clean Water Act cases from other jurisdictions, Defendants argue for a different mootness test: that Guardians must demonstrate that there is a "realistic prospect" that the violations alleged in the Complaint will continue, notwithstanding the Consent Orders, in order to avoid dismissal on the grounds of mootness.  As demonstrated by Guardians herein in its discussion on the proper burden of proof, the realistic prospect has not been adopted by this Circuit and is not applicable to moot a Clean Air Act citizen suit.  Furthermore, citizen suits under the Clean Air Act are precluded only by judicial enforcement actions, not by any administrative action.  As Defendants failed to demonstrate that Guardians' claims for declaratory and injunctive relief and for civil penalties are moot, Defendants' motion must be denied.

However, since asserting that Guardians' case is moot because "there is no possibility that any violations will continue as a result of the September 2010 and April 2011 Consent Orders," Defendants began renewed operations at the LRP and again violated their Clean Air Act permit, as evidence by their own emissions data.   So, even if it is Guardians' burden to show "a realistic prospect" that alleged violations will continue to occur, Guardians has met that burden: the violations are continuing.  As demonstrated by Defendants' own emission data, the possibility of future violations at the LRP notwithstanding the April 2011 Consent Order was not just a "reasonable prospect," but a certainty.  For the foregoing reasons, a live controversy still

exists and Guardians' claims for declaratory and injunctive relief and for civil penalties are not

moot, so Defendants' motion to dismiss must be denied.

## II.   Standard of Review

Defendants filed this motion to dismiss pursuant to Fed. R. Civ. Pro. 12(b)(1) for lack of

subject-matter jurisdiction.  Dkt. # 12 at 1 ("Def.'s Mot.").  In Holt v. United States, 46 F.3d

1000, 1002-03 (10th Cir. 1995), the Tenth Circuit stated that Rule 12(b)(1) motions to dismiss

for lack of jurisdiction generally take one of two forms, either a facial attack or a factual attack.

In a facial attack on the complaint's allegations questioning the sufficiency of the complaint, "a

district court must accept the allegations in the complaint as true." Id. at 1003.  In a factual

attack on subject matter jurisdiction where the party goes beyond the allegations contained in the

complaint, "a district court may not presume the truthfulness of the complaint's factual

allegations." Id.  However, the court then "has wide discretion to allow affidavits, other

documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule

12(b)(1)." Id. Generally, "[w]hen reviewing a motion to dismiss for lack of jurisdiction under

Fed. R. Civ. Pro. 12(b)(1), a court must review the complaint liberally, granting the plaintiff the

benefit of all inferences that can be derived from the facts alleged." Barr v. Clinton, 370 F.3d

1196, 1199 (D.C.Cir. 2004); see also Connolly v. Beckett, 863 F.Supp. 1379, 1381 (D.Colo.

1994).

## III.   Legal Background: The Clean Air Act

The Clean Air Act ("CAA") aims "to protect and enhance the quality of the Nation's air

resources so as to promote the public health and welfare."  42 U.S.C. § 7401(b)(1).  The Act is

intended to "speed up, expand, and intensify the war against air pollution in the United States

with a view to assuring that the air we breathe throughout the Nation is wholesome once again."

H.R. Rep. No. 91-1146, at 1 (1970), reprinted in 1970 U.S.C.C.A.N. 5356, 5356.

Section 304 of the CAA, 42 U.S.C. § 7604, known as the Act's "citizen suit provision,"

authorizes citizens to bring suit in federal court to enforce the Act.  Under 42 U.S.C. § 7604(a),

any person may file suit in federal district court against any person who is "alleged to have

violated (if there is evidence that the alleged violation has been repeated) or to be in violation of

(A) an emission standard or limitation under this chapter . . ."  An "emission standard or

limitation" is defined to include any "standard, limitation, or schedule established under any

permit issued pursuant to subchapter [title] V of this chapter . . . ."  Id., § 7604(f)(4).  The statute

confers "jurisdiction" on the district courts "to enforce such an emission standard or limitation"

in such suits through the issuance of injunctive relief and the imposition of civil penalties.  Id., §

7604(a).  The CAA citizen suit provision "reflected a deliberate choice by Congress to widen

citizen access to the courts, as a supplemental and effective assurance that the Act would be

implemented and enforced."  Natural Res. Def. Council v. Train, 510 F.2d 692, 700 (D.C. Cir.

1974).

42 U.S.C. § 7413(b), amended in part by the Debt Collection Improvement Act of 1996,

authorizes injunctive relief and civil penalties of up to $37,500 per day for each violation

occurring after January 12, 2009.  See also 42 U.S.C. § 7413(e); 28 U.S.C. § 2461(a); 40 C.F.R.

§ 19.4; 74 Fed. Reg. 626 (Jan. 7, 2009).

## IV.    **Factual Background**

In 2004, the City of Lamar, Lamar Utilities Board ("LUB"), and the Arkansas River

Power Authority ("ARPA") entered into a Joint Operating Agreement to "repower" LUB's

existing 25-megawatt gas-fired electric generation facility as a 38.5-megawatt coal-fired power plant.  Dkt. # 12-4 ("Rigel Aff.") at ¶ 3.  On February 3, 2006, CDPHE issued Permit Number 05PR0027 ("Permit") to Defendants for the construction and operation of the LRP as a coal-fired facility.[2]  In May of 2009, the LRP began generating electricity from its new coal-fired boiler. Rigel Aff. at ¶ 5.

The LRP is located near the center of town in Lamar, Colorado.  Compl. ¶ 2.  The LRP is three blocks off Main Street, less than 500 feet from a residential neighborhood, and within a mile from several elementary schools.  Compl. ¶ 2.  Guardians has at least six members that live within approximately one mile of the LRP.  Compl. ¶ 19.  They are concerned by the visible and foul-smelling emissions coming from the smokestack of the LRP.  Compl. ¶ 9.  They worry about harm to their health from breathing air that is impaired by excessive pollution from the LRP, about the soot from coal ash on their property, about the health of their children and grandchildren, and about the next time they will be woken up in the middle of the night to loud noises and malfunctions at the LRP.  Id.

A.      **Events Prior to Filing of Plaintiffs' Complaint on March 23, 2011**

After commencing operation in May of 2009, emissions at the LRP regularly exceeded the limits established in Permit No. 05PR0027 for the construction and operation of the LRP. Compl. ¶ 80, Ex. B to Compl.  The semi-annual emission reports submitted by Defendants to the Air Pollution Control Division ("Air Division") of CDPHE on January 29, 2010, July 29, 2010, and January 28, 2011 show repeated violations of the LRP's emission limits for NOX, SO2, CO,

---

[2]     The Permit has been modified twice, on August 21, 2007 and October 13, 2009.  The permit provisions relevant to the allegations in Guardians' Complaint did not change in the permit revisions in 2007 and 2009.

and opacity.  Compl. ¶ 80, Ex. C-F to Compl.  Defendants also failed to monitor emissions in accordance with Lamar's permit.  Id.

Defendants' history is replete with failed attempts to bring the LRP into compliance with the emission limits set forth in its Permit and the CAA.  On February 18, 2010, Defendants put the LRP back into service after being off-line for several months for the final installation of a selective non-catalytic reduction system for NOX control and to repair various boiler tube leaks. Compl. ¶ 93.  Despite these equipment modifications and Defendants' assurances that it would resolve its excess emission issues, the LRP continued to exceed its emission limitations for NOX, SO2, CO, and opacity.  Compl. ¶ 93, 94.

On February 23, 2010, Rick Rigel, Superintendant of the LUB, communicated in an email to Tom Garabedian, an employee or representative of Babcock & Wilcox, the boiler manufacturer for the LRP, that: "We cannot continue to operate knowingly exceeding the NOX requirements as we are now.  We must either reduce NOX very quickly or we will be forced to come off-line."  Compl. ¶ 94.  However, after February 23, 2010, Defendants continued to operate while knowingly exceeding their NOX emission limitations.  Compl. ¶ 95.  From July 1, 2010 though December 30, 2010, the LRP exceeded its 1.0 lb/MWh emission limit for NOX on 136 days.  Compl. ¶ 95.

In June 2010, a boiler tuning consultant from E-TECH Industrial Services performed a boiler tuning at the LRP, attempting to resolve the LRP's emission problems.  Compl. ¶ 96. Despite this boiler tune-up, the LRP continued to exceed its emission limitations for NOX, SO2, CO, and opacity.  Compl. ¶ 96.  In August of 2010, Defendants again went off-line several times to address problems with their boiler.  Compl. ¶ 97.  Despite these equipment inspections and

repairs, the LRP continued to exceed its emission limitations for NOX, SO2, CO, and opacity. Compl. ¶ 97.

On July 20, 2010, CDPHE, through the Air Division, issued a Compliance Advisory to the Defendants, based on a Semi-Annual Report received on February 2, 2010 and a review of the facility's records.  Dkt. #12-2.  On August 11, 2010, staff of the Air Division and the LUB met to discuss the issues identified in the Compliance Advisory.  Dkt. #12-3 at 2.  On September 24, 2010, Defendants LUB entered into a Compliance Order on Consent ("Sept. 2010 Consent Order") with CDPHE regarding the violations at the LRP.  As part of the Sept. 2010 Consent Order, LUB agreed to immediate compliance with the Colorado Air Pollution Control and Prevention Act[3] ("effective immediately and without limitation, Lamar shall comply with all provisions of the Act and the Regulations in the regulation and control of air pollutants from the facility").  Dkt. #12 at 7, Dkt. #12-3 at 5-6.  This Consent Order restated the conditions in Permit Number 05PR0027, but did not require additional terms or conditions, such as increased reporting or more stringent emission controls, to ensure that violations were prevented or more quickly detected and remedied.  Compl. ¶ 112, Dkt. #12-3.

The informal administrative enforcement action taken by the State of Colorado in September 2010 failed to stop Defendants from operating the LRP while knowingly violating their emission limits.  Even after entering into the Sept. 2010 Consent Order, the LRP continued to exceed emission limits set forth in its Permit for NOX, SO2, CO, and opacity.  Compl. ¶ 115.

---

[3]     The Colorado Air Pollution Prevention and Control Act ("Colorado Act"), C.R.S. Title 25, Art. 7, Part 2, provides for the implementation of the Clean Air Act and the attainment and maintenance of National Ambient Air Quality Standards.  Lamar's Permit includes these requirements.

In late September of 2010, Defendants performed tests and inspections of their equipment during a planned fall outage.  Compl. ¶ 98.  The LRP remained offline during October of 2011.  Dkt. #1-6 at 18.  In November of 2010, a service technician from Babcock & Wilcox, began work to tune Lamar's boiler.  Compl. ¶ 99.  However, despite these periods of being off-line for equipment inspections, tests, and repairs, the Lamar Plant continued to exceed its emission limitations for NOX, SO2, CO, and opacity once the plant resumed operations.  Compl. ¶ 99.

On December 30, 2010, a tube failure and/or other operations problems caused the LRP to go offline again.  Compl. ¶ 100.  According to the Defendants, "The plant was tripped offline at approximately 10:30 o'clock on December 30, 2010 after a steam tube ruptured.  It is believed the rupture was a result of the use of steam for the injection of ammonia into the system, which caused excessive corrosion to the exterior of the tube."  Def.'s Response to Pl.'s First Set of Interrogatories, No. 5., attached hereto as Exhibit A.   Emission violations at the LRP were ongoing when the plant went off-line.  Compl. ¶ 92.  The LRP remained offline from December 31, 2010 until July 15, 2011.  Ex. A at 7.

### B.   Guardians' Complaint

Guardians' Complaint, filed on March 23, 2011, details the history of Defendants' ongoing compliance problem.  Dkt. # 1.  The Complaint sets forth ten separate causes of action, which outline Defendants' Clean Air Act violations, as follows:[4]  Guardians' First Cause of Action alleges at least 406 violations of the LRP's NOX limitations (30-day rolling average of

---

[4]    The violations alleged in Guardians' Complaint are based on CEMS data for May 18, 2009 through December 31, 2010 submitted by Defendants to CDPHE.  By failing to limit and monitor emissions as set forth in Lamar's Permit, Defendants violated its Permit, the Colorado SIP, and the Clean Air Act.

1.0 lb/Mwh).  Compl. ¶¶ 117- 124.  Guardians' Second Cause of Action alleges at least 233

violations of the LRP's SO2 limitations (30-day rolling average of 1.4 lb/Mwh).  Compl. ¶¶ 125-

132.  Guardians' Third Cause of Action alleges at least 41 violations of LRP's opacity

limitations (20% opacity limit). Compl. ¶¶ 133-139.

Guardians' Fourth Cause of Action alleges at least 55 violations of the LRP's daily SO2

limitations (0.103 lb/mmBtu).  Compl. ¶¶ 140-145.  Guardians' Fifth Cause of Action alleges at

least 1,355 violations of the LRP's rolling three-hour average CO limitation (76.5 lb/hr).

Guardians' Sixth Cause of Action alleges that Lamar violated its monthly NOX limitations (17.4

tons per month) for at least four months in 2009.  Compl. ¶¶ 153-159.

Count Seven through Count Ten of Plaintiff's Complaint allege that Defendants failed to

continuously monitor NOX, SO2, CO, and opacity when operating the coal-fired boiler at the

LRP, as required by Lamar's Permit, the Colorado SIP, the CAA, and implementing regulations,

and failed to ensure compliance with its emission limitations.  Compl. ¶¶ 160-195.  According to

the semi-annual reports, Defendants failed to comply with Lamar's continuous opacity

monitoring requirements with at least 2,282 known minutes of unexcused downtime from May

18, 2009 to December 31, 2010.  Compl. ¶ 164.  Defendants failed to comply with Lamar's NOX

monitoring requirements with at least 1,957.8 known hours of unexcused downtime from May

18, 2009 to December 31, 2010.  Compl. ¶ 173.  Defendants failed to comply with Lamar's SO2

monitoring requirements with at least 1,934.8 known hours of unexcused downtime from May

18, 2009 to December 31, 2010.  Compl. ¶ 182.  Defendants failed to comply with Lamar's CO

monitoring requirements with at least 381.35 known hours of unexcused downtime from May

18, 2009 to December 31, 2010.  Compl. ¶ 190.

Based upon these allegations, Guardians requests that this Court: declare that Defendants'
operation of the LRP in excess of the emission limits set forth in their Permit violates the CAA;
declare that Defendants' failure to continuously monitor opacity violates their Permit and the
CAA; declare that Defendants' failure to continuously operate their CEMS violates their Permit
and the CAA; order Defendants to comply with their Permit and all applicable requirements
pursuant to the CAA, State, and federal regulations; order Defendants to take all necessary steps
to comply with all applicable emission standards, including, but not limited to, installing
adequate pollution controls and developing protocols and processes to eliminate violations of
their Permit and the CAA; enjoin Defendants from operating their coal-fired boiler unless and
until they demonstrate that they can successfully and continuously operate within the limits set
forth in their Permit and the CAA; enjoin Defendants from operating their coal-fired boiler
unless and until their COM system and CEMS equipment is functioning properly; assess a civil
penalty against the Defendants, jointly and severally, of up to $37,500.00 per day for each
violation of the CAA and applicable regulations; and award Guardians its cost and reasonable
attorneys' fees incurred in initiating and prosecuting this action; and grant such other relief as the
Court deems just and proper.  Compl. at p. 35-36.

### C.       New Events and Lamar's Continuing Violations

On April 29, 2011, the Defendants entered into a second Compliance Order on Consent
("April 2011 Consent Order") with CDPHE's Air Division.  See Dkt. #12-4.  The April 2011
Consent Order states: "Lamar agrees that it will not renew operations at the Facility until it
reasonably concludes that its modifications, adjustments, and/or re-design of the Facility result in
a Facility that will operate in compliance with the Act, the Regulations, and the Permit."  Id. at 5.

According to the agreement, "[t]he parties anticipate that the Preliminary Testing results will inform any decision by Lamar to renew operations at the Facility." Id. However, the consent agreement is devoid of any consequences if the LRP fails this Preliminary Testing.

In the April 2011 Consent Order, Defendants also agreed "not to operate the Facility, other than for limited testing purposes, until its compliance test(s) demonstrate that it will operate in full compliance with the Act, the Regulations, and [its Permit]." Id. at 3. "Testing" is not defined in the agreement. Lamar then has 60 days after resuming operations to perform compliance testing. Id. at 5. Furthermore, CDPHE may grant Lamar an unlimited extension of time to perform this testing, on top of its initial sixty days. Id. at 6. Following completion of the compliance testing, Lamar is not required to submit a report and the testing data to CDPHE for another 30 days. Id. Therefore, the LRP is permitted to operate without any compliance testing for months after resuming operation while local citizens are left to worry if the air they breathe is safe.

After reviewing the LRP's Compliance Testing, if CDPHE determines that Lamar "is not operating in compliance with the Act, the Regulations, and/or the Permit, it may provide Lamar with written notice requiring Lamar to immediately shut down the facility." Id. Even if Lamar is required to shut down the facility, it may again renew operations by "reasonably" concluding it will comply with its Permit, and then conducting Compliance Testing within another 60 days. Id.

Subsequent to the issuance of the April 2011 Consent Order, the LRP filed its Motion to Dismiss Plaintiff's Complaint as moot, which is pending before this Court. Dkt. # 12. Hoping to avoid an adverse judgment as to liability, and in an attempt to rush this Court to a judgment

before operations resumed at the LRP, Defendants argued that this case was moot because of the

Sept. 2010 and April 2011 administrative consent orders.  On June 24, 2011, this Court granted

Guardians' motion to conduct limited discovery on the issue of jurisdiction and to allow

Guardians an opportunity to file a supplemental or amended response brief once discovery is

complete.  Dkt. # 21.

The LRP came back online on July 15, 2011.  See Lamar Generation Reports, attached

hereto as Exhibit B, at ARPA_NOx020860.[5]  The LRP burned coal and generated electricity on

every day from July 23, 2011 through October 14, 2011, and from October 26, 2011 through

October 31, 2011.[6]  Id. at ARPA_NOx020859-ARPA_NOx020862.  Although some testing of

the facility occurred during this time, by August 2011, operation of the LRP looked exactly like

the operation of the LPR in Fall of 2010.  See Ex. C.  For example, during the month of

September 2011, the LRP produced 20,777,118 kilowatt-hours ("kWh") of energy.  Ex. C at 4.[7]

In August 2011, the LRP produced 13,776,599 kWh.  Id.  In contrast, the LRP produced

---

[5]     Guardians will identify documents by the BATES numbers provided by Defendants in their discovery responses whenever practicable.

[6]     Per agreement by the parties, Defendants produced emission, monitoring, and generation data for the LRP through October 31, 2011.

[7]     Ex. C is a true and accurate copy of the Defendants' Operating Summary for September 2011, which was document 5 in the ARPA Board Meeting Packet for October 27, 2011.  This is a public document that was provided to all ARPA board members at an open meeting.  See Affidavit of Ashley Wilmes at ¶ 2, attached hereto as Exhibit P.  This is the Defendants' own document, so there should be no question as to its authenticity.  Moreover, the undersigned's affidavit is sufficient for purposes of authenticating said document pursuant to Fed. R. Evidence 901. "Even without authentication through an affidavit or deposition, a document may be authenticated by circumstantial evidence which suggests the document is what it purports to be." Bhandari v. VHA Southwest Community Health Corp., 2011 WL 1336512, 4 (Dist. N.M. 2011). A court may also take judicial notice of facts in deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(1).  E.F.W. v. St. Stephen's Indian High Sch., 264 F.3d 1297, 1302-03 (10th Cir. 2001).

12,956,514 kWh in September 2010 and 18,149,880 kWh in November 2010.  Id.  Therefore, "testing" of the LRP produced more electricity in August and September of this year than the "operation" of the LRP did in September and November of last year.  Lamar also sold energy from the generation of the LRP this year to the Municipal Energy Association of Nebraska ("MEAN").  See Ex. C at 1; ARPA MEAN Bill Estimated Invoice, Hourly Load Report for September 2011, attached hereto as Exhibit J.  Energy generated by the LRP in 2011 was also used by ARPA's member municipalities.  Id.

More importantly, the Defendants' own emissions data shows that the LRP continued to violate its emission limits after resuming operation in July of 2011.  See Ex. D and E.  The following violations occurred notwithstanding the April 2011 Consent Order:  The LRP exceeded its daily emission limit for NOX (30 day rolling average) for 919.55 hours during the third quarter of 2011, which was 95% of the LRP's operating time.  Ex. D at ARPA_NOx020342.  The LRP exceeded its hourly emission limit (three hour rolling average) for CO for 235.82 hours during the third quarter of 2011, which was 24.4% of the LRP's operating time.  Id. at ARPA_NOx020338.  On August 31, September 1, and September 2, 2011, the LRP exceeded its 20% emission limit for opacity, for a total duration of 90 minutes of excess emissions.  Id. at ARPA_NOx020335.

The LRP also exceeded its daily emission limit for SO2 (30-day rolling average of 1.4 lb/Mwh) on every day from October 9 through October 31, 2022.  See Lamar's Monthly Emission2 Report for October 2011, attached hereto as Exhibit E, at ARPA_NOx020331. The LRP exceeded its 30DRA for NOx every day during the month of October.  Id.  The LRP exceeded its three hour rolling average for CO several times every day from October 2 through

October 5, 2011. <u>See</u> Lamar's October 2011 Daily Emission2 Report excerpts, attached hereto as Exhibit F. The LRP's CEMS data also shows several opacity violations on October 31, 2011. <u>See</u> Lamar's October 2011 Daily Six Minute Average Opacity Report excerpt, attached hereto as Exhibit G, at ARPA_NOx020297. Permit violations at the LRP were ongoing on October 31, 2011. <u>See</u> Ex. E.

On October 24, 2011, representatives of the Defendants the Air Division held a meeting regarding the LRP. Notes from this meeting state that Lamar will be submitting its emission data to the agency so that the Air Division can develop a new settlement.[8] <u>See</u> Notes from Shannon McMillan of CDPHE's Air Division, attached hereto as Exhibit H, p. 3 ("submit emissions data to Div. ASAP after [shutdown] so we can develop a settlement"). Notes from another staff member at the same meeting state that the Air Division should have the LRP's "violation" information and report by mid-November. <u>See</u> Notes from CDPHE's Air Division, attached hereto as Exhibit I, p. 2. Mr. McMillans' notes from that meeting also reference the "major structural modifications" that still need to occur at the Lamar Plant. Ex. H, p. 3. Defendants have not fixed the problems with the LRP and whether future modifications will ever allow the plant to operate in compliance with its Permit is unknown. Moreover, the notes state that there is no "set time frame for this work or when subsequent re-testing would occur." <u>Id.</u> These "new"

---

[8]     Exhibits H and I are true and accurate copies of public record documents that were provided to the undersigned by Ann Crouse and Christopher Dann of CDPHE as responsive to a Colorado Open Records Act ("CORA") request that Guardians' submitted to them regarding the Lamar Repowering Project. <u>See</u> Affidavit of Ashley Wilmes at ¶ 3-5. The undersigned's affidavit is sufficient for purposes of authenticating said document pursuant to Fed. R. Evidence 901. <u>See also</u> F.R.E. 901(b)(7) (providing that public records may be authenticated by showing that the records are "from the public office where items of [that] nature are kept"). Furthermore, these are records or statements of a public agency (Air Division) setting forth the activities of that agency, their content is admissible as an exception to the hearsay rule. <u>See</u> F.R.E. 803(8).

developments sound very similar to the LRP's pattern of operation and non-compliance over the past two and a half years.

## V.   <u>ARGUMENT</u>

Relying on distinguishable Clean Water Act ("CWA") cases from other jurisdictions, Defendants contend that this case is moot unless Guardians can demonstrate that there is a realistic prospect that Lamar's violations of its permit and the Clean Air Act ("CAA") will continue notwithstanding the Sept. 2010 and April 2011 administrative consent orders. Defendants articulate a test that it not applicable in CAA cases, especially where there is only informal administrative enforcement by a state agency, not a judicially-enforceable consent decree.  In the Tenth Circuit, it is the Defendants' burden to demonstrate mootness to this Court by showing that there is no reasonable expectation that their violations will recur and that these events have completely and irrevocably eradicated the effects of the alleged violations. Nevertheless, under either standard for determining mootness, Guardians' claim are not moot, as the LRP's violations continued notwithstanding the provisions of the April 2011 Consent Order. Furthermore, citizen suits under the CAA are precluded only by a lawsuit filed and diligently prosecuted in "a court of the United States or a State" ("judicial enforcement action"), not by any administrative action.  42 USCA § 7604(b)(B).  A live case or controversy continues to exist.

### A.   <u>Burden of Proof</u>:  **Defendants Bear the Heavy Burden of Demonstrating to the Court that Guardian's Claims Are Moot.**

Here, the jurisdictional question raised by the Defendants is one of mootness, so the Defendants bear the burden of proof.  A case is moot if a defendant can demonstrate that two conditions have been met: (1) interim relief or events have completely and irrevocably eradicated

the effects of the alleged violation; and (2) there is no reasonable expectation that the alleged

wrongs will be repeated.  County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979).

     "When changed circumstances extinguish a plaintiff's legally cognizable interest during

the pendency of a case, the case becomes moot and may require dismissal."  Copar Pumice Co.,

Inc. v. Tidwell, 603 F.3d 780, 792 (10th Cir. 2010) (citing Kansas Judicial Review v. Stout, 562

F.3d 1240, 1245 (10th Cir. 2009)).  The case becomes moot "[w]hen it becomes impossible for a

court to grant effective relief" and "a live controversy ceases to exist."  Stout at 1206.  "[T]he

conditions under which a suit will be found constitutionally moot are stringent . . . [A] case

properly brought in the first instance only becomes moot where 'interim relief or events have

***completely and irrevocably eradicated*** the effects of the alleged violation.'"  Building and

Const. Dept. v. Rockwell Intern. Corp., 7 F.3d 1487, 1491 (10th Cir. 1993) (emphasis added)

(citing County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).

     Repeatedly citing Black Warrior Riverkeeper, Inc. v. Cherokee Mining, LLC, 637

F.Supp.2d 983 (N.D. Ala. 2009), a Clean Water Act ("CWA") case from the Northern District of

Alabama, Defendants urge this Court to shift the burden consistently applied in the Tenth Circuit

and apply a stringent "realistic prospect" standard for the mootness test.  Def.'s Mot. at 14.  The

realistic prospect standard, which has not been adopted by this Circuit and is not applicable to

the facts of this case, shifts the burden of proof in a mootness test from the defendant to the

citizen group filing suit, requiring the citizen group to prove that there is a "realistic prospect"

that a defendant will continue to violate the statute in question.  Id.  However, this standard has

been explicitly rejected by other circuits, has heretofore only been applied to CWA cases, and

Supreme Court precedent does not support this test for mootness.  Moreover, the "realistic

prospect" standard should not be applied because it is not applicable to the facts of this CAA case.

The realistic prospect test utilized in Black Warrior Riverkeeper was adopted from the Fifth Circuit's decision in Environmental Conservation Organization v. City of Dallas, 529 F.3d 519, 528 (5th Cir. 2008), another CWA case.  The Fifth Circuit pulled the standard from Atlantic States Legal Foundation, Inc. v. Eastman Kodak, 933 F.2d 124 (2nd Cir. 1991), where the realistic prospect language was first used.  Eastman Kodak was a CWA citizen suit that addressed mootness after state enforcement agencies had taken official action against the permit violator.  However, Eastman Kodak was wrongly decided and ignored the mootness doctrine as articulated by the Supreme Court.  Furthermore, Eastman Kodak actually said nothing about the appropriate burden for establishing mootness, but was based upon the language and policy considerations of the CWA, not the CAA.

The decision in Eastman Kodak and the realistic prospect test have been explicitly rejected by other courts.  In Natural Resources Defense Council v. Loewengart & Co., Inc., 776 F.Supp. 996, 1000 (M.D.Pa. 1991), the court held that Eastman Kodak was wrongly decided and the standard should not be used where the defendant negotiated a consent order with a state regulatory agency after the plaintiff had filed suit.  The court explained:

> [The Clean Water Act] clearly provides that a citizen's suit can be commenced if the government does not file its own lawsuit within sixty days of the citizen's notice of its intent to do so.  If Congress had intended a citizen's suit to be dismissed when the government took initiative against the polluter at any subsequent time, it could have written the citizen's suit provision that way.  There is support for our conclusion. *Citing* Chesapeake Bay Foundation v. American Recovery Co., Inc., 769 F.2d 207 (4th Cir. 1985) (per curiam) (dicta); Connecticut Fund for the Environment, Inc. v. Upjohn Company, 660 F.Supp. 1397 (D.Conn. 1987).

Id. at 1000.  See also Environmental Protection Information Center v. Pacific Lumber Co., 430

F.Supp.2d 996, 1003 (N.D.Cal. 2006) (rejecting the realistic prospect test, "even in cases where

an agency's regulatory action may have mooted a suit" because "the Ninth Circuit applies the

standard that the party asserting mootness bears the heavy burden of persuading the court that the

case is moot.")

The court in Public Interest Research Group of New Jersey, Inc. v. Elf Atochem North

America, Inc., 817 F.Supp. 1164, 1171 (D.N.J. 1993) also explicitly rejected Eastman Kodak,

finding that "[i]ts reasoning is based on policy arguments invoking the purposes behind the

Clean Water Act . . . which may be instructive in interpreting the statutory preclusion provisions

of the Act itself but are irrelevant to the constitutional mootness issue."  Instead, the court looked

to whether, after the Defendant's settlement with the government, "there remains a live case or

controversy such that adverse parties will vigorously argue the conflicting contentions to the

court' and a decision by the court will have an impact on the parties."  Id. (quotations and

citations and omitted).

Moreover, courts employing the "realistic prospect" standard have used this test in CWA

cases, where citizen suit plaintiffs must prove ongoing violations.  See CWA, 33 U.S.C. §

1365(a)(1) ("any citizen may commence a civil action on his own behalf . . . against any person .

. . who is alleged to be in violation of . . . an effluent standard or limitation under this chapter").

As the Supreme Court held in Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,

484 U.S. 49, 50 (1987), this statutory "to be in violation" language requires that citizen-plaintiffs

"allege a state of either continuous or intermittent violation - that is, a reasonable likelihood that

a past polluter will continue to pollute in the future."

Conversely, the Clean Air Act, which was amended in 1990 after Gwaltney, permits citizen suits for continuing violations and past violations, so long as the past violations were repeated.  42 U.S.C. § 7604(a)(1) ("[A]ny person may commence a civil action on his own behalf . . . against any person . . . who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of . . . an emission standard or limitation under this chapter.").  See Paper, Allied-Indus., Chemical and Energy Workers Intern. Union, 2005 WL 1389431, 15 (W.D.Okla. 2005) ("The plain language of [the CAA] therefore permits citizen suits for continuing violations and wholly past violations, so long as the past violations were repeated."); Fried v. SunGard Recovery Servs., Inc., 916 F.Supp. 465, 467 (E.D.Pa. 1996) ("[T]he 1990 [CAA] Amendments overruled Gwaltney with respect to wholly past violations" and "permits citizen suits for both continuing violations and wholly past violations, so long as the past violation occurred more than once."); Adair v. Troy State Univ. of Montgomery, 892 F.Supp. 1401, 1409 (M.D.Ala. 1995) ("Congress explicitly authorized a citizen suit either where defendants *are* in violation of a standard, or where defendants *have* violated a standard.  This clearly includes past violations, so long as there is evidence that the violations were repeated."); Atl. States Legal Found. v. United Musical Instruments, 61 F.3d 473, 477 (6th Cir.1995) (in dicta, "after Gwaltney, Congress amended the Clean Air Act . . . explicitly to allow citizen suits for purely historical violations").  This is a CAA, not a CWA case, and the Defendants fail to cite a single case applying the realistic prospect test to moot a CAA citizen suit.

Furthermore, the realistic prospect tests should never apply outside the context of a judicially-enforceable consent decree, where compliance has been compelled by a government agency.  Courts have acknowledged the distinction between compliance being compelled by an

enforcement action, such as a court-approved consent decree[9], and those cases where a party

enters into a voluntary agreement with a regulatory agency, such as the Consent Orders at issue

in this case.  In <u>Louisiana Environmental Action Network v. City of Baton Rouge</u>, 2011 WL

1882439, 4 (M.D.La. 2011), citing <u>City of Dallas</u> at 528, the Court explained:

> There are two standards which courts apply to determine whether a case brought pursuant
> to the Act is moot. In the case of the parties entering into a voluntary agreement with a
> regulatory agency, the party asserting mootness must show that the alleged violations
> cannot reasonably be expected to recur.  In the case of compliance being compelled by an
> enforcement action, the party denying mootness must show that there is a realistic
> prospect that the alleged violations will continue despite the action.

<u>See also</u> <u>Louisiana Environmental Action Network v. Sun Drilling Products Corp.</u>, 716

F.Supp.2d 476, 478 (E.D.La. 2010) ("For cases where the parties entered into a voluntary

agreement with a regulatory agency, the party asserting mootness must show that the alleged

violations cannot reasonably be expected to recur.")

In this case, the April 2010 and September 2011 orders are "Compliance Orders on

Consent."  According to CDPHE, a compliance order on consent is a settlement agreement that

is mutually agreed upon by the parties: "The term compliance order on consent means the

settlement agreement or express terms, mutually agreed upon in writing, between the recipient of

an informal notice of noncompliance or NOV and the Air Pollution Control Division, resolving

the consequences of the discovered noncompliance."  <u>See</u> the Air Division's enforcement page,

---

[9]     <u>See</u>, <u>e.g.</u>, <u>City of Dallas</u>, 529 F.3d at 528 ("Far from voluntary, the City's compliance
with the terms of its . . . Permit and the CWA has been compelled by an EPA enforcement
action" against the City in federal district court "and the resulting court-approved consent
decree."); <u>Comfort Lake</u>, 138 F.3d at 354-355 (citizen suit mooted by termination of the
Defendants' CWA permit and enforcement order entered by the Minnesota Pollution Control
Agency over Defendants' opposition).

available at http://www.cdphe.state.co.us/ap/enforcerept.html.[10]  The Defendants engaged in

settlement negotiations with the Air Division regarding these compliance orders on consent.  See

e.g., email chain between Joseph Dishinger, attorney for Defendants, to Michael Skorupka and

Steven Mah at CDPHE, and others, p. 2, discussing terms of September 2010 Compliance Order

on Consent, attached hereto as Exhibit K.[11]  Defendants' continued back-room negotiations with

the Air Division at CDPHE and the possibility of another settlement with the agency also shows

that these compliance agreements are voluntary.  See Ex. H and I (CDPHE staff notes).  CDPHE

did not compel compliance in this case and the Consent Orders allow the Defendants free reign

to continue to violate their emission limits, as is further evidenced by Defendants' recent record

of non-compliance.

"It is well settled that 'a defendant's voluntary cessation of a challenged practice does not

deprive a federal court of its power to determine the legality of the practice.'"  Friends of the

Earth, Inc. v. Laidlaw Envt'l Services, Inc., 528 U.S. 167, 189 (2000) (citations omitted).  "If it

did, the courts would be compelled to leave the defendant . . . free to return to his old ways."  Id.

(citations omitted).  "[T]he court's power to grant injunctive relief survives the discontinuance of

the illegal conduct."  U.S. v. W. T. Grant Co., 345 U.S. 629, 633 (1953).  See also City of

---

[10]     A court may take judicial notice of matters of public record, including an agency's public website.  See Parker v. Robinson, 2008 WL 1924376, 2 (D. Colo. 2008); Coleman v. Dretke, 409 F.3d 665, 667 (5th Cir. 2005).

[11]     Exhibit K is a true and accurate copy of a public record document that were provided to the undersigned by Ann Crouse of CDPHE as responsive to a CORA request submitted by Guardians regarding the LRP.  See Affidavit of Ashley Wilmes at ¶ 6-7.  The undersigned's affidavit is sufficient for purposes of authenticating said document pursuant to Fed. R. Evidence 901.  See also F.R.E. 901(b)(7) (providing that public records may be authenticated by showing that the records are "from the public office where items of [that] nature are kept").  Furthermore, these are records or statements of a public agency (Air Division) setting forth the activities of that agency, their content is admissible as an exception to the hearsay rule.  See F.R.E. 803(8).

<u>Dallas</u> at 527, citing <u>Gwaltney</u> at 66 (When considering voluntary cessations of CWA violations "[t]he defendant must demonstrate that it is absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." This standard is appropriate because it "protects plaintiffs from defendants who seek to evade sanction by predictable protestations of repentance and reform.")

In fact, United States Supreme Court cases addressing the mootness test for citizen suit actions have never supported a realistic prospect test. Those decisions involving environmental citizen suits have supported a stringent mootness test that places the burden of proof on the defendant. For instance, in addressing the issue of mootness in the case of a CWA citizen suit in <u>Gwaltney</u>, the Supreme Court stated that "the defendant's burden is a heavy one" and that the "defendant must demonstrate that it is *absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur." 484 U.S. at 67 (emphasis in original) (*citing* <u>United States v. Concentrated Phosphate Export Assn., Inc.</u>, 393 U.S. 199, 203 (1968)).

The Supreme Court has admonished that "[i]t is no small matter to deprive a litigant of the rewards of its efforts," and that dismissal on mootness grounds "would be justified only if it were absolutely clear that the litigant no longer had any need of the judicial protection that it sought." <u>Adarand Constructors, Inc. v. Slater,</u> 528 U.S. 216, 224 (2000). In <u>Laidlaw</u>, the Supreme Court reiterated that "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness. 528 U.S. at 189 (*citing* <u>Concentrated Phosphate Export Assn.</u>, 393 U.S. at 203). Therefore, as stated by the Court in <u>Los Angeles County v. Davis</u>, 440 U.S. 625, 631 (1979), it is the Defendants' burden to demonstrate mootness to the court by proving that: "(1) it can be said with

assurance that 'there is no reasonable expectation . . .' that the alleged violation will recur," *citing* U.S. v. W. T. Grant Co., 345 U.S. 629, 632 (1953), and "(2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."

In Friends of the Earth v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167 (2000), although the Laidlaw facility was "closed, dismantled, and put up for sale, and all discharges from the facility permanently ceased," Laidlaw, 528 U.S. at 179, the Supreme Court declined to find the case moot because "the effect of both Laidlaw's compliance and the facility closure on the prospect of future violations" was "a disputed factual matter." Id. at 193. For instance, Laidlaw had retained its permit and presumably could have rebuilt the facility and again violated the Act. Id. The court held that these subsequent events "might" moot the case, but "only if one or the other of these events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Id. at 189 (*quoting* Concentrated Phosphate, 393 U.S. at 203).

Finally, whether due to a defendant's voluntary cessation of challenged activity or some other intervening event, the Tenth Circuit has held that the burden of demonstrating that a claim is moot lies solely on the party asserting mootness. See Copar Pumice Co., Inc. v. Tidwell, 603 F.3d 780, 792 (10th Cir. 2010) (not an issue of voluntary cessation of challenged conduct, but finding that the "heavy" burden of demonstrating mootness lies with the party asserting mootness); Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1116 (10th Cir. 2010) (party asserting mootness based on voluntary cessation of a challenged practice bears the heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again, where the government); Am. Constitutional Law Found., Inc. v.

Meyer, 1997 WL 282874, 2 (10th Cir. 1997) (not an issue of voluntary cessation of challenged

conduct, but noting burden of showing mootness is "heavy one"); Kan. Judicial Review v. Stout,

562 F.3d 1240, 1245 (10th Cir. 2009) (not an issue of voluntary cessation, but stating that a

"party claiming that there is no longer a live case or controversy bears the burden of

demonstrating mootness"); In re Snowville Farms, LLC  2007 WL 1302154, 3 (10th Cir. BAP

2007) (not an issue of voluntary cessation, but stating that "[t]he party asserting mootness has a

heavy burden to establish there is no effective relief remaining for a court to provide").

**B.     Guardians' Claims for Declaratory and Injunctive Relief Are Not Moot, as a Live Case and Controversy Exists Between the Parties**

Guardians' claims for declaratory and injunctive relief are not moot, as this case presents

a live controversy that is not rendered moot by subsequent events.  Defendants argued in their

Motion to Dismiss that "there is no possibility that any violations will continue" as a result of the

September 2010[12] and April 2011 Consent Orders because both "required Defendants to

implement measures to abate the alleged violations and provide a sufficient guarantee that the

violations will cease."  Def.'s Mot., Dkt. # 12 at 17.  However, according to emission reports

produced by the Defendants during jurisdictional discovery, violations at the LRP are continuing.

---

[12]     The September 2010 Consent Order was certainly not a sufficient guarantee that violations at the LRP would cease, as emission exceedances for $NO_X$, $SO_2$, CO, and opacity continued on an almost daily basis after this agreement.[12]  For example, based on its Semi-Annual Report, the LRP exceeded its 1.0 lb/MWh emission limit for $NO_X$ 1326.80 hours in the fourth quarter of 2010, or according to Defendants' own approximation, "103.2% of its operating time."  Compl. ¶ 120.  Defendants argue that they took numerous step to achieve full compliance with Lamar's permit and to reduce emissions at the facility after this September 2010 Consent Order.  Def.'s Mot. at 8.  However, despite these failed attempts, Defendants continued to operate the LRP while knowingly exceeding their permitted limits for dangerous pollutants, such as $NO_X$ and $SO_2$.  Until a tube failure tripped the boiler off-line on December 30, 2010, Defendants allowed the Lamar plant to continue spewing pollution into the air, despite monitoring data showing that their emissions were well beyond what was safe for human health.

See Ex. C and D.  Since coming back online on July 15, 2011, the LRP has logged new and repeated violations of its permitted limits for NOX, SO2, CO, and opacity.  Id.

Defendants may argue that all violations at the LRP since the plant came back online in July 2011 don't count because they occurred during "testing" of the facility.  However, exceedances of the emission limits set forth in Lamar's Permit are still violations of the Clean Air Act, irrespective of Defendants' contention that the LRP has free reign to pollute under the guise of "testing."  Irrespective of the label placed on the LRP's operation over the past several months, the LRP has been generating, using, and selling electricity.  To Guardians' members who continue to be harmed by the foul smells, visible emissions, and dangerous NOx exceedances coming from the LRP, "testing" this year looks exactly like "operation" last year.

### 1.      Violations at the LRP are Continuing

According to the LRP's Quarterly Summary Report for the third quarter of 2011 (August 1, 2011 through September 30, 2011), violations at the LRP continued notwithstanding the April 2011 Consent Order.  Defendants continued to violate the Clean Air Act by failing to limit NOX emissions at the LRP to a 30-day rolling average ("30DRA") of 1.0 lb/MWh, as required by Lamar's Permit and the applicable NSPS regulations for NOX, 40 C.F.R. § 60.44Da(e)(1).  The LRP exceeded its 30DRA emission limit for NOX for 919.55 hours during the third quarter of 2011, which was 95% of the LRP's operating time.  See Ex. D at ARPA_NOx020342.   The LRP's monthly emission report for October also shows that the LRP exceeded its 30DRA for NOx every day during the month of October.  See Ex. E at ARPA_NOx020331.

Defendants continued to violate the CAA by failing to limit SO2 emissions at the LRP to a 30-day rolling average of 1.4 lb/MWh, as required by Lamar's Permit and the applicable NSPS

regulations for NOX, 40 C.F.R. § 60.44Da(i)(1).  The LRP exceeded its 30DRA emission limit

for SO2 on every day from October 9 through October 31, 2022.  <u>See</u> Ex. E at

ARPA_NOx020331.

Defendants continued to violate the CAA by failing to limit CO emissions at the Lamar

Plant to the rolling three hour rolling average of 76.5 lb/hour, as required by Lamar's Permit.

The LRP exceeded its hourly emission limit for CO for 235.82 hours during the third quarter of

2011, which was 24.4% of the LRP's operating time.  <u>See</u> Ex. D at ARPA_NOx020338.  The

LRP's daily emission report for October also shows that the LRP exceeded its three hour rolling

average for CO several times every day from October 2 through October 5, 2011.  <u>See</u> Ex. F at

ARPA_NOx020299-ARPA_NOx020304.

Defendants continued to violate the CAA by failing to limit the opacity of emissions at

the LRP to 20%, as required by Lamar's Permit and the applicable NSPS regulations, 40 C.F.R.

§ 60.42Da(b).  On August 31, September 1, and September 2, 2011, the LRP exceeded its 20%

emission limit for opacity, for a total duration of 90 minutes of excess emissions.  <u>See</u> Ex. D at

ARPA_NOx020335.  The LRP's CEMS data also shows several opacity violations on October

31, 2011.  <u>See</u> Ex. G at ARPA_NOx020297.

Based upon Defendants' own emission data, they cannot demonstrate that it is ***absolutely***

***clear*** that their violations could not reasonably be expected to recur, because violations did, in

fact, occur.  <u>Concentrated Phosphate Export Assn</u>. 393 U.S. at 203.  Even if it is Guardians'

burden to show that there is "a realistic prospect that the violations alleged in the complaint will

continue notwithstanding the administrative consent order" (Def.'s Mot. at 13), Guardians has

met that burden: the violations are continuing.  <u>See</u> Ex. D-F.  Defendants' recent violations, set

forth in their own emission reports, demonstrate that Guardians' claims for relief are still ripe for

adjudication.  Guardians' request for injunctive relief is the best, and perhaps the only, way to

assure that the LRP complies with its Permit and stops polluting the air that Guardians' members

breathe every day.

For the purposes of responding to Defendants' Motion to Dismiss, even under the

realistic prospect standard for mootness argued by the Defendants, Guardians need not prove all

of these violations.  Defendants may have a defense to some of them.  However, as articulated by

the Defendants, the question was whether there is a "clear basis to infer that Defendants will

continue to engage in the conduct complained of in [Guardians'] Complaint."  Dkt. 12 at 15.

Defendants' own emission reports show repeated violations that occurred notwithstanding the

April 2011 Consent Order.  Further, Defendants admit that "[s]ome NOx, SO2, and CO

exceedances occurred in connection with the testing of the facility."  Def.'s Supp. Response to

Pl.'s Request for Admission No. 2, attached hereto as Exhibit L.   Based upon this tangible

evidence,[13] it cannot now be said that there is "no realistic possibility of any future violations in

light of the Consent Orders.  See Def.'s Mot., Dkt. 12 at 17.

### 2. Defendants' Recent Violations are Not Excused by the "Testing" Provisions of the April 2011 Compliance Order

Pursuant to the April 2011 Consent Order, Defendants agreed "not to operate the Facility,

other than for limited testing purposes, until its compliance test(s) demonstrate that it will

operate in full compliance with the Act, the Regulations, and [its Permit]."  Dkt. # 12-4 at 3.  The

---

[13]    This Court "has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." Holt v. United States, 46 F.3d at 1003.

Consent Order also states: "Lamar agrees that it will not renew operations at the Facility until it reasonably concludes that its modifications, adjustments, and/or re-design of the Facility result in a Facility that will operate in compliance with the Act, the Regulations, and the Permit." Id. at 5. According to the agreement, "[t]he parties anticipate that the Preliminary Testing results will inform any decision by Lamar to renew operations at the Facility." Id.

Guardians anticipates that Defendants will argue that all violations at the LRP since the plant came back online in July 2011 occurred during "testing" of the facility, not during "operation" of the facility. However, this argument has no merit, as Defendants may not use an administrative consent agreement to shield its liability for future violations of the CAA. The LRP does not have free reign to pollute until they decide that their operation no longer constitutes "testing." Regardless of whether Defendants are in violation of their April 2011 Consent Order, their emission exceedances are violations of their Permit and the CAA.

Further, based upon the LRP's electricity generation reports, operating capacity, and sale of electricity during the past three months, the Defendants' operation of the LRP cannot be characterized as the "limited testing" anticipated in the consent agreement. Although testing did occur, operation of the LRP was not "limited" to testing, since the LRP has been operating on an almost daily basis since mid-July. This year's "testing" looks the same as last year's "operation," regardless of what Defendants choose to call it. More importantly, whether pollution is being emitted by a tester or an operator, the harm to Guardians' members from the foul smells, visible emissions, and dangerous NOx exceedances coming from the LRP is the same. The controversy as to Guardians' members is not moot.

First, the emission exceedances described herein are violations of the LRP's Permit and the CAA, and whether those exceedances occurred during testing authorized by the April 2011 Consent Order is irrelevant.  Consent Orders do not supersede permits and their terms do not replace the requirements of the CAA and Colorado Act.  There is no exception in the LRP's Permit or the CAA for "testing" of the plant under these circumstances; rather, the emission limits apply at all times.  For example, the LRP is subject to the NOx limitations set forth in the New Source Performance Standards for electric steam generating units, which state that "the owner or operator **shall not cause to be discharged** into the atmosphere any gases that contain NOx . . . in excess of 130 ng/J (1.0 lb/MWh) gross energy output on a 30–day rolling average basis . . ."  40 C.F.R. § 60.44Da (emphasis added).  As set forth in the Defendants' own reports, the LRP has regularly discharged gases into the atmosphere in excess of this limit.  See Ex. E and F.  Whether or not Defendants contend that these excess emissions occurred during "testing" pursuant to the April 2011 Consent Order bears no relation to whether the Defendants continue to violate the Clean Air Act.

Even if the LRP's operation over the past few months was contemplated under the testing provisions of the Consent Decree, under the test as articulated by the Defendants, the question was whether there was a realistic prospect that the violations alleged in Guardians' Complaint would continue to occur notwithstanding the Consent Orders.  Def.'s Mot., Dkt # 12 at 20.  The LRP's recent violations affirmatively answer "yes" to that question.  In fact, the LRP's failed ongoing noncompliance and repairs demonstrate that the problems at the LRP are not fixed and that violations will continue to occur.

Second, the operation at the LRP over the past few months far exceeds "limited testing" as the plant is generating, distributing, and selling electricity.  The LRP came back online following the April 2011 Consent Order on July 15, 2011.  See Ex. B.  During the month of September 2011, when many of the violations enumerated above occurred, the LRP produced 20,777,118 total kilowatt-hours ("kWh") of energy.  See Ex. C at 4.  In August 2011, the LRP produced 13,776,599 kWh.  Id.  In contrast, the LRP produced 12,956,514 kWh in September 2010 and 18,149,880 kWh in November 2010.  Id.  Peak generation at the LRP often reached 80% of capacity.[14]  See Lamar Daily Peak Generation Report, attached hereto as Exhibit M.  For instance, on September 24-25, 2011 and Sept 28-29, 2011, the LRP reached a maximum capacity of 40 megawatts, which is 93% of the LRP's operating capacity.  Id. at ARPA_NOx020857.  Although Defendants may characterize this as testing, more electricity was produced in months this fall than during last year's "operation" of the plant.

The energy produced by the LRP from July 2011 through October 2011 was also put onto the grid and used by ARPA's member municipalities.  As explained by the Defendants in response to Guardians' interrogatory requesting "the destination of the electricity generated by the [LRP]" on "every day on or after July 15, 2011 that the Lamar Repowering Project was burning fuel":

> With respect to the use of the electricity generated by the [LRP], the [LRP] consumes approximately 3.5 to 6 MW/hour for its own internal consumption (i.e., "plant load).  With respect to the destination of the electricity generated by the [LRP], for all electricity generated above and beyond the plant load, electricity from the LRP is blended with

---

[14]      The LRP includes a 25 MW steam turbine, Unit 6, and an 18 MW steam turbine, Unit 8.  The LRP has a total gross operating capacity of 43 MW per hour.  See Defendants' website, at http://www.lamarlightandpower.com/generation_portfolio.html.  Ex. M shows the maximum capacity at which the LRP operated from July 2011 through October 2011.

> electricity from ARPA's other electric generation resources to meet the energy demands
> of it Member Municipalities. . . .

In fact, the LRP supplied 71% of the energy that was used by ARPA's member municipalities in

September 2011.  See Ex. C at 1, 9.

Defendants also generated revenue from supplying this power to ARPA's member

municipalities.  In September 2011, revenue from member sales were $2,517,181.67.  See Ex. C,

p. 6 ("Revenues")[15].  In comparison, revenue from member sales in September 2010 were

approximately $2,490,000.00.  Id.  Furthermore, Defendants regularly sold energy produced by

the LRP during this time to the Municipal Energy Association of Nebraska (MEAN).  For

example, in September 2011, 2,560,610.00 kWh was sold to MEAN.   See Ex. J.  During

September, the LRP also supplied 541,098 kWh more to MEAN than it purchased.  Id.

Defendants' "testing" in September 2011 certainly looks very similar to its "operation" in

September 2010.

The LRP is not simply testing its equipment, but rather is generating large amounts of

electricity, putting that energy on the grid, and selling the excess energy to MEAN.  The LRP

produced more electricity in September 2011 than any other month in the past year.  Ex. C at 4.

In short, a review of the LRP's "Operating Report" for September 2011 clearly demonstrates that

the LRP is operating, and not engaged in mere "testing."

---

[15]     These figures include revenue generated from ARPA's other energy sources in its
portfolio, such as wind turbines.  However, these figures are quoted for comparison purposes,
and at least 71% of the blended energy sales would be from the LRP.

**C.     As the Consent Orders do Not Fully Address the Violations alleged in Guardians' Complaint, This Court May Grant Effective Relief to Guardians.**

Defendants spend considerable time pointing out the similarities between the violations alleged in Guardians' complaint and those set forth in the Consent Orders.  However, the Consent Orders failed to address Guardians' allegations regarding Defendants' monitoring failures, certain opacity exceedances, and penalties for those violations.

Count 3 of Guardians' Complaint alleges that the LRP "exceeded the 20% opacity limit during four (4) 6-minute intervals in the second quarter of 2009, during one (1) 6-minute interval in the third quarter of 2009, during twenty (20) 6-minute intervals in the third quarter of 2010, and during sixteen (16) 6-minute intervals in the fourth quarter of 2010."  Compl. p. 25-26.  The The Sept. 2010 and April 2011 Consent Orders do not redress these alleged violations.  Section 13 references opacity compliance ("Lamar agrees to take all steps necessary to achieve compliance with the NOx, SO2, CO, opacity, and CEMS limits in its Permit"), but it not address the LRP's specific opacity violations.

Counts seven through ten of Plaintiff's Complaint allege that Defendants failed to continuously monitor NOX, SO2, CO, and opacity when operating the coal-fired boiler at the LRP, as required by Lamar's Permit, the Colorado SIP, the Clean Air Act, and implementing regulations, and that Defendants failed to ensure compliance with its emission limitations. Compl. ¶¶ 160-195.  According to the semi-annual reports submitted to CDPHE, Defendants failed to comply with Lamar's monitoring requirements for NOX, SO2, CO, and opacity, with thousands of hours of unexcused monitor downtime from May 18, 2009 to December 31, 2010.[16]

---

[16]     Lamar's Quarterly Summary Report also shows new monitoring violations (unexcused monitoring downtime).  See e.g., Ex. D at ARPA_NOx020334 (126 hour of COMS downtime).

Compl. ¶¶ 164, 173, 182, 190.  Defendants deny that the April 2011 Consent Order fails to address the monitoring violations alleged by Guardians in Counts Seven though Ten of the Complaint.  Defendants state that "CEMS monitoring is specifically addressed in Sections 7(g) and 13 of the April 2011 Consent Order."  See Def.'s Answer to Pl.'s Request for Admission No. 5, attached hereto as Ex. N.  Although these provisions of the Consent Order reference CEMS monitoring, they do not address the violations (unexcused monitoring downtime) alleged in Guardians' Complaint.   Section 7(g) addresses the accuracy of the CEMS, resulting in *overestimation* of emissions.  Dkt. #12-4 at 4.  Section 13 is the general provision in the Consent Decree which provides:

> Lamar agrees to take all steps necessary to achieve compliance with the NOx, SO2, CO, opacity, and CEMS limits in its Permit. Lamar agrees that it will not renew operations at the Facility until it reasonably concludes that its modifications, adjustments, and/or re-design of the Facility result in a Facility that will operate in compliance with the Act, the Regulations, and the Permit . . .

Id.  However, this provision does not address the Defendants' failure to monitor emissions, as alleged in the Complaint.

The Consent Orders do not cite any violations of opacity and monitoring requirements, nor do they redress Defendants' failure to monitor pollutants in accordance with Lamar's Permit. CDPHE also failed to assess penalties for the opacity and monitoring violations alleged in Guardians' Complaint.  In its Complaint, Guardians' requested relief includes enjoining Defendants from operating their coal-fired boiler unless and until their COM system and CEMS equipment is functioning properly.  Compl. at 35.  An ongoing controversy therefore exists as to these allegations.

"To establish mootness, a defendant must show that the court cannot order any effective relief." San Francisco BayKeeper, Inc. v. Tosco Corp., 309 F.3d 1153, 1159 (9th Cir. 2002). See also Church of Scientology of California v. U.S., 506 U.S. 9, 12 (1992). "When it becomes **impossible** for a court to grant effective relief, a live controversy ceases to exist, and the case becomes moot." Kansas Judicial Review v. Stout, 562 F.3d 1240, 1246 (10th Cir. 2009) (emphasis added), *citing* United States v. Hahn, 359 F.3d 1315, 1323 (10th Cir. 2004). "The available remedy, however, does not need to be 'fully satisfactory' to avoid mootness." Calderon v. Moore, 518 U.S. 149, 150 (1996) (*citing* Church of Scientology, 506 U.S. at 13). "To the contrary, even the availability of a 'partial remedy' is 'sufficient to prevent [a] case from being moot.'" Id.

The Consent Orders also do not provide the full relief sought by Guardians in this case. They do not require the additional emission reduction equipment that may be required to make the necessary emission reductions at the LRP.  The Consent Orders also fail to require additional terms or conditions, such as increased reporting or more stringent emission controls, to ensure that violations are prevented or more quickly detected and remedied.  Compl. ¶ 112.  See e.g., Interfaith Community Organization Inc. v. PPG Industries, Inc., 702 F.Supp.2d 295, 301 (Dist. N.J. 2010) (finding that citizen suit under RCRA was not rendered moot by consent judgment between operator of chrome production facility and state environmental agency, where plaintiffs sought remedies outside those provided in consent judgment).

Guardians has at least six members that live within approximately one mile of the LRP who have witnessed and suffered harm from Defendants' irresponsible operation of the plant and ongoing lack of due care in controlling air pollution.  Compl. ¶¶ 17, 19.  These members live,

work, garden, and engage in outdoor recreation and family activities in areas affected by Defendants' insufficient monitoring of air pollution, excessive emissions, and violations of Lamar's Permit.  Compl. ¶ 18.  Guardians' members have logged incidents of foul smells, visible emissions, painfully loud noises, and mechanical problems at the LRP.  Compl. ¶ 19.  This Court may also order effective relief in the form of Supplemental Environmental Projects that would benefit Guardians' members and the local community of Lamar.  See e.g., Cantrell v. City of Long Beach, 241 F.3d 674, 678 (9th Cir. 2001) (case not moot because order requiring additional environmental review could lead to additional mitigations for birds' habitat); Neighbors of Cuddy Mountain v. Alexander,  303 F.3d 1059, 1066 (9th Cir. 2002) (challenge to logging project not moot by cutting of trees because court could order mitigation and monitoring measures).

This Court should and may grant effective relief beyond the weak terms that Defendants negotiated for in these Consent Orders.  Defendants have repeatedly demonstrated a substantial disregard for public health and the safety of its neighbors, by continuing to operate the LRP, despite knowing that its emissions are well beyond its permitted limits.  Only the full relief requested in Guardians' complaint will redress these members' injuries.

**D.     Guardians' Claims for Relief are Not Rendered Moot by Informal Administrative Consent Orders**

Defendants cite to multiple CWA cases from other jurisdictions for the proposition that subsequent enforcement actions result in a finding that there is no realistic prospect[17] that the

---

[17]     As set forth above, it is not Guardians' burden to demonstrate that there is a realistic prospect that Lamar's violations will continue notwithstanding these administrative Consent Orders.  Moreover, the "realistic prospect standard" should not be applied because it is inapplicable to the facts of this case.

alleged violations will continue, rendering the case moot.  Def.'s Mot., Dkt. #12 at 18.  However,

most of these cases involved judicially-enforceable consent decrees or are otherwise not

applicable in the case of an inadequate informal administrative consent order negotiated between

the agency and the violator.

Environmental Conservation Organization v. City of Dallas, 529 F.3d 519 (5th Cir.

2008), cited by Defendants, held that a **later-filed judicial consent decree** by the government

mooted that citizen suit by ending the violations at issue.  Id. at 528 (noting that the Defendant's

compliance was "compelled by an EPA enforcement action and the resulting court-approved

consent decree.")  City of Dallas involved a level of agency enforcement so stringent and

comprehensive that plaintiffs could not show a "realistic prospect that the CWA violations...

[would] continue." Id. at 529.  The court also noted that ECO had a right to intervene in the

enforcement action before the district court granted EPA's unopposed motion to enter the

consent decree, "but declined to do so despite the district court's encouragement." Id. at 523.

Subsequently, the district court approved the consent decree, described by the court as "a lengthy

and detailed document" that required, among other things:

> that the City pay $800,000 in civil penalties, undertake supplemental environmental
> projects totaling at least $1.2 million, meet minimum staffing requirements in its
> environmental quality and sewer system monitoring departments, and provide ongoing
> compliance reports to the EPA. The City is also subject to an audit of its storm water
> system within three years of the consent decree's entry and must pay stipulated penalties
> if it is found to be in violation of any of its provisions. The decree's appendices provide
> strict timetables for satisfaction of these provisions, which are posted on a website and
> available to the public.

Id. at 523-524.

In contrast, the LRP was never the subject of a judicial enforcement action and is not

bound by a court-ordered decree.  Therefore, there was no opportunity for Guardians to intervene

in a judicial forum to object to the Consent Orders, produce evidence relevant to Defendants'

violations, or otherwise challenge their failure to adequately and permanently address the issue

of Lamar's repeated violations and to redress Plaintiff's injuries.  The Consent Orders do not

provide for additional monitoring, stipulated penalties, public availability of emission test results,

or other effective relief that this Court may grant.

Ohio Valley Environmental Coalition, Inc. v. Hobet Mining, 2008 WL 5377799, 6

(S.Dist.W.Va. 2008), relied on by Defendants, also involved a court-enforceable consent decree.

There, the court found that "[t]he subsequent resolution of the state's enforcement action -

through a **binding and judicially enforceable consent decree** - renders the present action

partially moot."  Id. (emphasis added).  The Court explained that the consent decree was "not

simply an agency issued permit or compliance order" but "[r]ather, it is a settlement reviewed

and approved by the Boone County Circuit Court.  Such a consent decree has the force of a court

order."  Id. at 8.

Here, instead of a judicially enforceable consent decree, there is only a non-public back-

room deal[18] between Defendants and CDPHE that resulted in a Consent Order that fails to

provide assurances that the Agency will take any affirmative enforcement action as a result of

the LRP's new emission violations.  These Consent Orders do not have the force of law and

Defendants may not be found in contempt for disregarding their terms.  Even if the Air Division

determines that Lamar is not operating in compliance with the Act, the Regulations, and/or the

Permit, its decision to require Lamar to shut down the facility is discretionary and not

mandatory.  See Dkt. #12-4 at 5.  Furthermore, CDPHE staff notes from a recent meeting

---

[18]     Such back-room deals continue, as evidence by the possibility of another settlement with
CDPHE over ongoing violations at the LRP.  See Ex. H (CDPHE staff notes).

between representatives of the Defendants and the Air Division state that Lamar will be submitting its emission data to the agency so that the APCD can develop a new settlement.  See Ex. H at 3 ("submit emissions data to Div. ASAP after [shutdown] so we can develop a settlement").  Despite CDPHE's apparent knowledge of the LRP's new violations, CDPHE has not issued the LRP a notice to shut down the facility.

Congress placed a citizen enforcement provision in the CAA precisely to address situations such as this one: where government efforts have not been sufficient to bring a violator into sustained compliance.  As noted recently by the Seventh Circuit:

> Congress . . . chose not to place absolute faith in state and federal agencies. It provided for citizen suits to enable affected citizens to push for vigorous law enforcement even when government agencies are more inclined to compromise or go slowly. The plaintiffs in this case are doing nothing more than exercising the rights that Congress gave them to protect their own health and safety.

Adkins v. VIM Recycling, Inc., 2011 WL 1642860, 16 (7th Cir. May 3, 2011) (construing similar citizen enforcement provision of the Resource Conservation and Recovery Act).  Therefore, Guardians' claims for relief are not moot.

**E.   Guardians' Claims for Civil Penalties are Not Moot.**

For the reasons set forth above, this case is not moot, which includes Guardians' claim for civil penalties.  However, even were Guardians' claims for injunctive relief moot – which is dispelled based upon the LRP's recent emission reports showing violations – Guardians' claims for civil penalties are not moot.  Civil penalties under the Clean Air Act provide relief for violations actually committed and deter future violations of the Act.  That deterrent effect provides relief notwithstanding the Consent Orders.

As stated by the Third Circuit, "[w]hile the more difficult analytical questions are presented by demands for injunctive and declaratory relief, the availability of damages or other monetary relief almost always avoids mootness." Jersey Cent. Power & Light Co. v. State of N.J., 772 F.2d 35, 41 (3d Cir. 1985)(citations omitted).  Courts have generally treated civil penalties as damages for this purpose, such that even where a claim for injunctive relief is mooted by discontinuance of the challenged illegal conduct or a subsequent event, claims for civil penalties survive.

In Old Timer, Inc. v. Blackhawk-Central City Sanitation Dist., this Court held that a citizen's claim for civil penalties against a sanitation district for violations under the CWA was not rendered moot by the defendant's post-complaint compliance with its permit.  51 F.Supp.2d 1109, 1116 (D.Colo. 1999).  This Court noted that the "overwhelming majority of circuits considering this issue have held that even if a polluter's post-complaint compliance moots a citizen's claim for injunctive relief, the citizen's claim for civil penalties is not moot."[19] Id. Similarly, in Anderson v. Farmland Industries, Inc., 70 F.Supp.2d 1218, 1236 (D.Kan. 1999), the District of Kansas, *citing* Old-Timer, held that a CAA citizen suit for civil penalties against a refinery for reporting violations was not rendered moot by the refinery's post-complaint correction of its reports and implementation of a correct system of reporting.

---

[19] *Citing* Comfort Lake Ass'n, Inc. v. Dresel Contracting Inc., 138 F.3d 351, 356 (8th Cir. 1998); Atl. States Legal Found., Inc. v. Stroh Die Casting Co., 116 F.3d 814, 820 (7th Cir. 1997); Natural Res. Def. Council, Inc. v. Texaco Ref. & Mktg. Inc., 2 F.3d 493, 503 (3d Cir. 1993); Atl. States Legal Found., Inc. v. Pan Am. Tanning Corp., 993 F.2d 1017, 1021 (2d Cir. 1993); Carr v. Alta Verde Indus. Inc., 931 F.2d 1055, 1065 n. 9 (5th Cir. 1991); Atl. States Legal Found., Inc. v. Tyson Foods Inc., 897 F.2d 1128, 1135 (11th Cir. 1990); Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp., 807 F.2d 1089, 1094 (1st Cir. 1986).

In <u>Reich v. Occupational Safety and Health Review Commission</u>, the Eleventh Circuit also recognized that claims for money generally "do not become moot as a result of the defendants' acts following the occurrence giving rise to the claims." 102 F.3d 1200, 1202 (11th Cir. 1997). The court reasoned that "[u]nlike injunctive relief addresses only ongoing or future violations, civil penalties address past violations; liability attaches at the time the violation occurs." <u>Id.</u> (*citing* <u>Chesapeake Bay Foundation, Inc. v. Gwaltney of Smith- field, Ltd.</u>, 890 F.2d 690, 696 (4th Cir. 1989) (liability for civil penalties "is fixed by the happening of an event . . . that occurred in the past.")). <u>See also</u> <u>Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.</u>, 807 F.2d 1089, 1094 (1st Cir.1986) ("A plaintiff who makes allegations warranting injunctive relief in good faith, judged objectively, may recover a penalty judgment for past violations even if the injunction proves unobtainable."); <u>Pub. Interest Research Grp. of N.J., Inc. v. Elf Atochem N. Am., Inc.</u>, 817 F.Supp. 1164, 1172 (D.N.J. 1993) ("The possibility that substantial additional penalties may be imposed - just like the possibility of penalties where none have yet been paid - creates a sufficient case or controversy to avoid mootness. Even though in this case specific deterrence is impossible since defendant no longer owns the facility, the imposition of additional penalties would fulfill the general deterrence function of penalties under the Act and thus provide 'effectual relief' to plaintiffs.")

In <u>San Francisco BayKeeper, Inc. v. Tosco Corp.</u>, 309 F.3d 1153, 1160 (9th Cir. 2002), the Ninth Circuit held that the subsequent event of the refinery being sold to another company did not moot civil penalties. The fact that a new owner took over the facility did not make "the deterrent effect of civil penalties any less potent." <u>Id.</u> (*quoting* Ecological Rights Foundation v. Pacific Lumber Co. 230 F.3d 1141, 1153 (9th Cir. 2000) (new permit did not moot claim for

civil penalties because of deterrent effect of civil penalties)).   In Association of Irritated

Residents v. Fred Schakel Dairy, 460 F.Supp.2d 1185, 1191 (E.D.Cal. 2006), a CAA citizen suit

brought against a dairy farm, that court also held that plaintiff's claims for civil penalties were

not moot, even though the local air pollution control agency had subsequently taken

administrative action against the dairy.   The court explained:

> Civil penalties serve as an alternative to an injunction to deter future violations and
> thereby redress the injuries that prompted a citizen suitor to commence litigation.   As is
> ordinarily the case with monetary relief, liability for civil penalties under the [CAA]
> attaches at the time the violations occur not at the time of the judgment.   That a defendant
> ceases illegal conduct following the commencement of suit ordinarily does not suffice to
> moot a case because civil penalties still serve as a deterrent to future violations.

Id. (citations omitted).

As articulated by the Supreme Court in Friends of the Earth v. Laidlaw Environmental

Services (TOC), Inc., 528 U.S. 167 (2000), civil penalties "serve, as an alternative to an

injunction, to deter future violations and thereby redress the injuries that prompted a citizen

suitor to commence litigation."   Id. at 174.   In that case, the Fourth Circuit had found that a

citizen's suit against Laidlaw was moot because the Clean Water Act violations had ceased,

reasoning that civil penalties paid to the government would not provide any effective relief to the

plaintiff.   149 F.3d 303, 306–07 (4th Cir.1998).   The Supreme Court reversed, because civil

penalties would still serve as a deterrent to future violations.   528 U.S. at 186.

In a CAA citizen suit case, the court in St. Bernard Citizens For Environmental Quality,

Inc. v. Chalmette Refining, L.L.C., 399 F.Supp.2d 726, 740 (E.D.La. 2005), held that an ongoing

state administrative enforcement action and the resulting consent order did not relieve the

defendant of its liability for civil penalties under the CAA, since civil penalties were appropriate

to extent that they would deter refinery from further violation of its permit limits.   Quoting

Laidlaw, supra, the Court noted that the defendant asserting mootness "bears the formidable burden of showing that is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." Id.

Here, the deterrent effect of civil penalties will ensure that Defendants have an incentive to comply with the terms of the Permit and the Consent Orders, in addition to other applicable requirements of the Clean Air Act and Colorado SIP. Defendants intend to resume operating the LRP, and must continue to comply with applicable air pollution requirements. They have not offered evidence to show that the deterrent effect of civil penalties has become moot. Although the Consent Orders set forth administrative penalties of $109,550,[20] this is not a sufficient deterrent. This penalty is woefully insufficient, especially since this represents only three (3) violations, were the maximum penalty of $37,500 per day for each violation to be assessed. Conversely, if liability is found for the 2,212 violations alleged in Guardians' Complaint, this court will have authority to impose more than $78,500,000 million dollars in penalties. See 42 U.S.C. § 7413(b), amended in part by the Debt Collection Improvement Act of 1996; 42 U.S.C. § 7413(e); 28 U.S.C. § 2461(a); 40 C.F.R. § 19.4; 74 Fed. Reg. 626 (Jan. 7, 2009). For the foregoing reasons, Guardians' claims for civil penalties is not moot.[21]

---

[20]    Defendants assert that they have paid $224,000 in penalties. However, $114,485.00 of this amount was an "economic benefit" penalty, which is the economic benefit of a facility's non-compliance and should not be considered as a deterrent.

[21]    Even if the court were to conclude that Guardians' claims for injunctive relief are moot, the burden is still on Defendants to prove the mootness of civil penalties. Anderson v. Farmland Indus., Inc., 70 F.Supp.2d 1218, 1237 n. 15 (D.Kan. 1999) ("The Court notes that even if it finds injunctive relief moot . . . the burden is on the defendant to also prove mootness of civil penalties.")

**F.      Guardians' Citizen Suit is Proper and Not an Impermissible Collateral Attack on the Penalties Assessed in the Consent Orders**

Defendants also make a more general argument falling outside the context of mootness: that plaintiff's claims for civil penalties are precluded by the Consent Orders as an impermissible collateral attack on the penalties contained therein or because deference should be given to the state agency's administrative action. Def.'s Mot. at 20-21. To the contrary, citizen suit provisions play an important role in the CAA's enforcement scheme. See Weiler v. Chatham Forest Products, Inc., 392 F.3d 532, 536 (2nd. Cir. 2004). "[C]itizen suit provisions were designed not only to motivate government agencies to take action themselves, but also to make citizens partners in the enforcement of the Act's provisions. Citizens serve as a supplemental and effective assurance that the Act [is] implemented and enforced." Id. (internal quotations and citations omitted).

Defendants' argument is also misguided, because it is based upon cases interpreting the CWA[22], which contains a separate provision explicitly granting preclusive effect to certain administrative penalty actions. See 33 U.S.C.A. § 1319(g)(6). For example, in Comfort Lake, relied upon by the Defendants for this proposition, the court found that the issue was ***not one of mootness***, but held that an administrative enforcement agreement between the state agency and the polluter would preclude a pending citizen suit claim for civil penalties if the agreement was

---

[22]      These cases are also factually distinguishable from the small penalties set forth in the informal administrative enforcement order at issue here. See City of Dallas at 523 ($800,000 in civil penalties and $1.2 million in supplemental environmental projects in a judicially-approved consent decree, where the plaintiffs had a right to intervene in EPA's court enforcement action in federal court); Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc., 138 F.3d 351, 358 (8th Cir. 1998) (giving deference to the agency's *formal determination* that "there is no likelihood" violations would recur); Hobet Mining, 2008 WL 5377799, 9 (where court-enforceable consent decree required the defendant to pay civil penalties of $4,088,315).

the result of a "diligently prosecuted enforcement process" under the CWA.  Id. at 138 F.3d at

356-357.  The court was guided by the statutory language of the CWA, which specifically

precludes a citizen suit for penalties with respect to violations for which governmental agencies

have either (1) commenced and are diligently prosecuting or (2) have issued a final order not

subject to further judicial review and the alleged violator has paid a penalty.  See 33 U.S.C.A. §

1319(g)(6).  Hobet Mining, 2008 WL 5377799, 7 also cited by the Defendants, relies upon

Comfort Lake and City of Dallas, another CWA-specific opinion that is based upon a diligent

prosecution analysis.

Conversely, under the CAA, a citizen suit is only precluded only by a lawsuit filed in

court, and not by any other administrative action.  42 U.S.C. § 7604(b)(B); St. Bernard Citizens

for Envtl. Quality, Inc. v. Chalmette Refining, L.L.C., 348 F.Supp.2d 765, 768 (E.D.La. 2004)

(citing Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d

789, 795 (5th Cir.2000)).  In Crown Petroleum, defendants in a CAA citizen suit, as here, argued

that administrative action by a state agency deprived the federal courts of Article III jurisdiction

over the case.  The agency in Crown Petroleum had issued a comprehensive order assessing

nearly $1.1 million in penalties, and directed the company to retain independent expert

consultants to evaluate the causes of the violations and recommend remedial action.  Id.

However, the court held that the state environmental agency's administrative action against the

defendants did not preclude the plaintiff's citizen suit under the CAA, as citizen suits were only

precluded by civil actions brought by an agency in court, not in administrative or non-judicial

proceedings.  Id. at 794.  Similarly, Guardians' CAA citizen suit is not precluded or rendered

moot by CDPHE's action.

The LRP has an ongoing compliance problem and Defendants have repeatedly failed in their attempts to bring the LRP into compliance with its emission limitations, as set forth in the Permit and the Clean Air Act.  Although Defendants have made repeated promises to CDPHE over the last two years that modifications were being made to reduce the LRP's emission exceedances, the LRP has never successfully come into compliance with its Permit.  Compl. ¶ 104.  Notwithstanding this non-compliance, Defendants continued to operate the plant throughout 2010 while knowingly exceeding its emission limits.  Almost a year has passed since the LRP shut-down on December 30, 2011.  However, little has changed.  Defendants continue to make assurances to CDPHE that future modifications will allow the plant to operate in compliance with its Permit.  In the meantime, Defendants allow the LRP to operate under the guise of "testing," while repeatedly violating emission limits that are meant to protect public health.

## CONCLUSION

Since resuming operation in mid-July of 2011, Defendants violations continued, notwithstanding the April 2011 Compliance Order.  Therefore, for the reasons set forth above, Guardians respectfully requests that this Court deny the Defendants' Motion to Dismiss asserting that Guardians' claims are moot.

Dated: November 23, 2011

Respectfully submitted,

*/s/ Ashley D. Wilmes*
Ashley D. Wilmes
WildEarth Guardians
827 Maxwell Avenue, Suite L
Boulder, Colorado 80304
Tel. 859-312-4162
awilmes@wildearthguardians.org

*/s/ James J. Tutchton*
James J. Tutchton
WildEarth Guardians
6439 E. Maplewood Ave.
Centennial, CO 80111
Tel. 720-301-3843
jtutchton@wildearthguardians.org

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz
WildEarth Guardians
312 Montezuma Ave.
Santa Fe, NM 87501
Tel. 505-988-9126 x1158
sruscavagebarz@wildearthguardians.org

*Attorneys for Plaintiff WildEarth Guardians*

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on this 23rd day of November 2011, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following e-mail addresses of counsel of record:

Craig N. Johnson
Joseph B. Dischinger
Jason B. Robinson
1700 Lincoln Street, Suite 2400
Denver, Colorado 80203
Email: cjohnson@fwlaw.com
Email: jrobinson@fwlaw.com

              */s/ Ashley D. Wilmes*
              Ashley D. Wilmes

**Exhibits**

A.    Defendants' Response to Guardians' First Set of Interrogatories

B.    Lamar's Generation Reports for July - October 2011

C.    Lamar's Operating Summary for September 2011

D.    Lamar's Quarterly Summary Report, Third Quarter 2011

E.    Lamar's Monthly Emission2 Report for October 2011

F.    Lamar's October 2011 Daily Emission2 Report excerpts

G.    Lamar's October 2011 Daily Six Minute Average Opacity Report excerpt

H.    Notes from Shannon McMillan of CDPHE's Air Division

I.    Notes from CDPHE's Air Division

J.    ARPA MEAN Bill Estimated Invoice, Hourly Load Report for September 2011

K.    Steven Mah Email

L.    Defendants' Supp. Response to Guardians' Request for Admissions

M.    Lamar Daily Peak Generation Report

N.    Defendants' Response to Guardians' Request for Admissions

O.    Affidavit of Ashley Wilmes

P.    Attachment 1 to Affidavit of Ashley Wilmes